Michael **GONZALES,** Appellant,

v.

The **STATE** of Texas, Appellee.

No. **10–98–062–CR.**

Court of Appeals of Texas,
Waco.

Oct. 20, 1999.

Dick Turner & Michael H. Byrne, Cleburne, for appellant.

Dale Hanna, District Attorney, David W. Vernon, Asst. District Attorney, Cleburne, for appellee.

Before Chief Justice DAVIS, Justice CUMMINGS, Justice VANCE.

## O P I N I O N

REX D. DAVIS, Chief Justice.

A jury convicted Appellant Michael Gonzales of indecency with a child and assessed punishment at twenty years' confinement and a $10,000 fine. *See* TEX. PEN.CODE ANN. § 21.11(a) (Vernon 1998).

Gonzales presents three issues on appeal in which he claims that the trial court erred when it: (1) denied his motion for directed verdict and request for mistrial because there was insufficient evidence to sustain his conviction; (2) denied his motion to suppress; and (3) allowed the State to call a witness who was not on its witness list and allowed an unqualified witness to testify as an expert.

We affirm the conviction.

1. Gonzales is the victim's brother-in-law and

## FACTUAL AND PROCEDURAL BACKGROUND

On July 16, 1997, Anders Dahl, an Investigator at the Somervell County Sheriff's Office, received information that E.B., a thirteen year old, had been molested by Gonzales.[1] Dahl contacted Stephanie Williams, an Investigator with the Texas Department of Child Protective Services ("CPS"), and asked her to assist him with his investigation. Dahl and Williams contacted E.B.'s mother and told her about the allegations and informed her that they wanted to interview E.B. on the following day.

During the interview, E.B. stated that Gonzales began sexually assaulting her when she was seven years old. E.B. also stated that on May 16, 1997, Gonzales touched and rubbed her vagina and inserted his finger inside her vagina. E.B. stated that at the time of the touching, she was in her mother's bedroom taking care of Gonzales' and her sister's infant son. E.B. stated that Gonzales came into the room and sat next to her on the bed. E.B. stated that Gonzales then placed his hand inside her underwear and rubbed her vagina. E.B. stated that she told him many times to stop and tried to push him off of her. E.B. stated that Gonzales stopped after approximately one minute, when the baby began to cry. E.B. stated that Gonzales then took the baby and left the room.

The same day that E.B. gave her statement, Dahl went to Gonzales' house with E.B.'s mother. Gonzales' daughter let Dahl and E.B.'s mother in the house. Once inside, Dahl woke Gonzales and asked him to come to the sheriff's office with him to discuss some family issues. Gonzales agreed and rode to the sheriff's office with Dahl.

Once at the sheriff's office, Dahl ushered Gonzales into an interview room. Dahl then read Gonzales his *Miranda* rights and had him sign a *Miranda* card at approximately 12:12 p.m. After Dahl in-

is married to her sister.

formed Gonzales of the allegations against him, Gonzales agreed to give a statement. Dahl then read Gonzales the statement form's *Miranda* warnings and Gonzales again indicated that he wanted to give a statement. While Gonzales dictated his statement to Dahl, Investigator Doug Ransom of the Somervell County Sheriff's Department entered the interview room. After Gonzales finished dictating, Dahl gave Gonzales' statement to Ransom. Ransom once again read Gonzales the *Miranda* warnings that appear on the statement form and had Gonzales initial them to indicate that he understood and waived these rights. Ransom then read over the statement with Gonzales and asked him if he had any changes. Gonzales made his changes, initialed them, and then signed his statement in the presence of Dahl and Ransom at approximately 1:17 p.m. Dahl and Ransom then signed Gonzales' statement.

After Gonzales signed his statement, Dahl called Gonzales' wife and mother-in-law into his office. Dahl informed them that Gonzales had just made a written statement confessing to the allegations against him. Dahl then informed Gonzales and his family that they were free to leave the sheriff's office. Gonzales was subsequently indicted on one count of aggravated sexual assault and one count of indecency with a child.

Gonzales filed a motion to suppress his confession on the grounds that Dahl's promise that he could go home if he signed the statement rendered his confession involuntary. The trial court denied his motion to suppress and held that his statement was freely and voluntarily made.

At trial, E.B. denied being assaulted by Gonzales. E.B. stated that during her interview, Dahl and Williams typed a statement that falsely accused Gonzales of molesting and assaulting her. E.B. testified that she only signed the statement because Dahl and Williams told her that if she did not sign it, that she would not be able to go home.

The State attempted to impeach E.B. by calling four impeachment witnesses. The State's first impeachment witness, Williams, testified that E.B. freely and voluntarily gave her statement and that neither she nor Dahl promised E.B. anything in exchange for her signature on her statement. During Williams' testimony, E.B.'s signed statement that described Gonzales' sexual touching of her vagina while she took care of Gonzales' infant son was admitted into evidence. Williams testified that E.B. gave this statement freely and voluntarily. At the conclusion of Williams' testimony, the trial court instructed the jury that Williams' testimony was not to be used to prove the matter asserted but was only to be used to judge E.B.'s credibility.

The State then called its second impeachment witness, Betty Witherspoon, a Child Protective Specialist Four with the Texas Department of Protective and Regulatory Services. Witherspoon testified that in August of 1992 she received a report that E.B., then eight years old, had been sexually assaulted by Gonzales. Witherspoon testified that she interviewed E.B. and her mother at the Somervell County Sheriff's Department. Witherspoon stated that E.B. told her that Gonzales had touched her many times between her legs and that once he tried to penetrate her rectum with his penis. Witherspoon testified that she typed up E.B.'s statement and that E.B. and her mother both signed the statement.

The State then called its third impeachment witness, Donna Dooley, a dispatcher with the Somervell County Sheriff's Department. Dooley testified that while she was on duty on November 18, 1997, E.B. came into the sheriff's office to report ongoing sexual abuse. Dooley testified that she and two assistant district attorneys talked to E.B. while she was at the sheriff's office. Dooley testified that during this conversation, E.B. stated that Gonzales had touched her vagina.

The State then called its fourth impeachment witness, Dr. Mark Schneider, a doctor at the Glen Rose Medical Center. Dr. Schneider examined E.B. in August of 1992 for signs of sexual assault. Dr. Schneider testified that E.B. told him that someone had tried to penetrate her rectum. Dr. Schneider testified that he examined her rectum and found some redness, a physical sign consistent with E.B.'s statement.[2]

After the State rested, Gonzales made a motion for directed verdict on the grounds that there was no evidence to support the count of aggravated sexual assault because there was no evidence presented that he penetrated her vagina with his finger and that there was no evidence of the *corpus delicti* of indecency with a child other than his confession. The State announced that it was proceeding only on the count of indecency with a child. Gonzales re-urged his motion for directed verdict as to the count of indecency with a child and the trial court denied his motion. The jury convicted Gonzales of indecency with a child.

## MOTION FOR DIRECTED VERDICT

Gonzales' first issue claims that the trial court erred when it denied his motion for directed verdict because there is no evidence, other than his uncorroborated confession, that the *corpus delicti* of the offense of indecency with a child occurred and therefore, the evidence was insufficient to support his conviction. Specifically, Gonzales claims that there is no evidence, notwithstanding his confession and the State's limited-purpose impeachment testimony, to prove that the crime of indecency with a child was committed.

■ An appeal from the denial of a motion for directed verdict is the same as a challenge to the legal sufficiency of the evidence to support the conviction. *Dunn v. State*, 951 S.W.2d 478, 480 (Tex.Crim. App.1997); *Love v. State*, 972 S.W.2d 114, 118 (Tex.App.—Austin 1998, pet. denied). When reviewing the legal sufficiency of the evidence, we review the evidence in the light most favorable to the State and determine whether, based on that evidence and all reasonable inferences therefrom, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *Brooks v. State*, 990 S.W.2d 278, 283 (Tex.Crim.App. 1999).

■ A defendant's extrajudicial confession alone is not sufficient to support a conviction. *Williams v. State*, 958 S.W.2d 186, 190 (Tex.Crim.App.1997); *Emery v. State*, 881 S.W.2d 702, 705 (Tex.Crim.App. 1994). There must be other evidence independent of the confession that tends to prove the *corpus delicti*.[3] *Williams*, 958 S.W.2d at 190; *Emery*, 881 S.W.2d at 705; *Gribble v. State*, 808 S.W.2d 65, 71 (Tex. Crim.App.1990). The independent evidence of the *corpus delicti* does not need to connect the defendant to the crime, be sufficient by itself to prove the crime nor be a great quantum of evidence; it only needs to be some evidence which renders the *corpus delicti* more probable than it would be without the evidence. *Williams*, 958 S.W.2d at 190; *Emery*, 881 S.W.2d at 705; *Chambers v. State*, 866 S.W.2d 9, 15–16 (Tex.Crim.App.1993); *Gribble*, 808 S.W.2d at 70–71.

■ The *corpus delicti* of indecency with a child is the occurrence of a sexual

---

2. Gonzales objected to each impeachment witness' testimony on the basis that it was impeachment testimony regarding a collateral matter. After Williams testified, Gonzales objected to each subsequent impeachment witness' testimony on the basis that once impeachment is complete, the State cannot continue to call impeachment witnesses.

3. The *corpus delicti* of a crime consists of the fact that the crime in question has been committed by someone. *McDuff v. State*, 939 S.W.2d 607, 615 (Tex.Crim.App.1997), *cert. denied*, 522 U.S. 844, 118 S.Ct. 125, 139 L.Ed.2d 75 (1997).

touching of the child with the intent to arouse or gratify the sexual desire of any person. TEX. PEN.CODE ANN. §§ 21.01(2), 21.11(a)(1) (Vernon 1998); *Moreno v. State*, 823 S.W.2d 366, 367 (Tex.App.— Corpus Christi 1991, pet. ref'd).

Gonzales argues that the impeachment witness testimony cannot be used to render the *corpus delicti* more probable than not. He argues that impeachment testimony is used exclusively to determine the credibility of the witness and is not probative evidence of the crime in question. Therefore, the State's sole piece of evidence is his uncorroborated confession which is not sufficient to render the *corpus delicti* more probable than not.

 Gonzales is correct in stating that testimony admitted only for impeachment purposes is without probative value and cannot be used to determine the sufficiency of the evidence to support a defendant's conviction. *Goodman v. State*, 665 S.W.2d 788, 792 n. 2 (Tex.Crim.App.1984); *Key v. State*, 492 S.W.2d 514, 516 (Tex. Crim.App.1973); *Adams v. State*, 862 S.W.2d 139, 147 (Tex.App.—San Antonio 1993, pet. ref'd). However, the *corpus delicti* rule allows an appellate court to consider *"all the record evidence, other than [the defendant's] extrajudicial confession,"* in the light most favorable to the jury's verdict when determining whether the evidence tended to prove the corpus delicti more probable than not. *Fisher v. State*, 851 S.W.2d 298, 303 (Tex.Crim.App. 1993) (emphasis added); *see also Mestiza v. State*, 923 S.W.2d 720, 726 (Tex.App.— Corpus Christi 1996, no pet.); *Garza v. State*, 915 S.W.2d 204, 210 (Tex.App.— Corpus Christi 1996, pet. ref'd); *Criner v. State*, 868 S.W.2d 29, 30 (Tex.App.—Beaumont 1994, pet. ref'd).

 The record evidence, notwithstanding Gonzales' confession and the impeachment testimony of four witnesses, consist-

ed of E.B.'s sworn statement that Gonzales sexually touched her.[4] As mentioned before, the record evidence does not have to be sufficient in itself to prove the offense; it merely needs to render it more probable than not. E.B.'s statement described in detail how Gonzales put his hands underneath her clothes and touched her vagina and continued to do so long after she begged him to stop. This statement, viewed in the light most favorable to the verdict, is some evidence which renders the *corpus delicti* more probable than not.

We overrule Gonzales' first issue.

## MOTION TO SUPPRESS

Gonzales' second issue claims that the trial court erred when it denied his motion to suppress because Dahl's promise that if he signed the statement he would be free to go home, rendered his confession involuntary. Gonzales further claims that Dahl and Ransom took advantage of his low intelligence and coerced him to sign his confession because they did not fully explain his *Miranda* rights to him nor did they make sure than he understood that he was waiving his *Miranda* rights when he signed his confession.

 At a motion to suppress hearing, the trial court is the trier of facts and the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997). When reviewing a trial court's ruling on a motion to suppress, we must afford almost total deference to the trial court's application of law to fact questions which turn upon an evaluation of the credibility and demeanor of the witnesses. *Loserth v. State*, 963 S.W.2d 770, 772 (Tex.Crim.App.1998); *Guzman*, 955 S.W.2d at 89. We must view the record evidence and all its reasonable inferences in the light most favorable to the trial court's ruling and sustain the trial

---

4. We do not decide today whether impeachment testimony, admitted for a limited purpose, may be considered when determining if the record evidence renders the *corpus delicti* more probable than not.

court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case. *Guzman,* 955 S.W.2d at 89. However, we review *de novo* the trial court's determination of mixed questions of law and fact that do not turn upon an evaluation of the credibility and demeanor of the witnesses. *Id.*

At the hearing, the parties disputed the historical facts surrounding Gonzales' confession. Therefore, the trial court's determination turned upon the credibility of the witnesses and the weight to be given their testimony and thus, we review it with almost total deference. *Id.*

 A suspect's statement may be used against him when it is freely and voluntarily made without compulsion or persuasion. Tex.Code Crim. Proc. Ann. art. 38.21 (Vernon 1998); *Campos v. State,* 977 S.W.2d 458, 464 (Tex.App.—Waco 1998, no pet.). Whether a suspect's statement is voluntary is determined from the totality of the circumstances surrounding the giving of his statement. *Penry v. State,* 903 S.W.2d 715, 748 (Tex.Crim.App. 1995). A suspect's statement is involuntary if it is induced by a promise that was: (1) positive; (2) of some benefit to the suspect; (3) made or sanctioned by someone in authority; and (4) of such an influential nature that a defendant would speak untruthfully in response thereto. *Creager v. State,* 952 S.W.2d 852, 856 (Tex.Crim. App.1997); *Blanks v. State,* 968 S.W.2d 414, 421 (Tex.App.—Texarkana 1998, pet. ref'd).

The trial court held a pre-trial suppression hearing to determine whether Gonzales' statement was voluntarily given. At the hearing, Dahl testified that he told Gonzales from the moment Gonzales stepped into the sheriff's office that he was not under arrest and that he was free to leave at any time. Dahl testified that once at the sheriff's office, he *Mirandized* Gonzales. Dahl testified that Gonzales indicated to him that he understood these rights and signed a *Miranda* card attesting to that understanding. Dahl stated that he told Gonzales about the allegations against him and that Gonzales agreed to discuss the allegations with him. Dahl testified that after he and Gonzales discussed the allegations, Gonzales agreed to make a written statement. Dahl once again read Gonzales his *Miranda* rights and Gonzales communicated to him that he understood these rights. Dahl testified that he then read Gonzales the waiver paragraph on the voluntary statement form and Gonzales indicated that he still wished to waive his *Miranda* rights and began to dictate his statement. Dahl stated that he told Gonzales before he signed his statement that he was not under arrest. Dahl stated that he did not promise Gonzales that he could go home if he signed the statement and that Gonzales was free to go at any time during the questioning. Dahl testified that Gonzales was released after he signed his statement.

However, Gonzales testified that Dahl promised him that if he signed his statement, he would be released and could go home. Gonzales claims that this promise was of such magnitude that it rendered his confession involuntary.

 Even assuming that Dahl did make such a promise to Gonzales, this promise was not of such an influential nature that it would influence Gonzales to speak untruthfully. *See Blanks,* 968 S.W.2d at 421. As mentioned before, Dahl told Gonzales from the beginning that he was not under arrest and that he was free to leave. Dahl further read Gonzales his *Miranda* rights on three separate occasions before Gonzales signed his confession. We agree with Gonzales that Dahl's alleged promise was positive, of some benefit, and was made by someone in authority. Even though Gonzales was told several times that he was free to go home at any time, that he was not under arrest, and that he did not have to answer any questions, such representations were not promises that would influence Gonzales to

speak untruthfully and thus render his confession involuntary.

 Gonzales further claims that Ransom took advantage of his low intelligence when Ransom failed to read his *Miranda* rights to him. Gonzales states that Ransom knew he was of low intelligence because Ransom's wife, a high school special education teacher, had Gonzales as a student.[5] Gonzales claims that Ransom's failure to read his *Miranda* rights to him and his failure to verify that he actually understood and voluntarily waived his *Miranda* rights rendered his confession involuntary.

 A suspect is entitled to *Miranda* warnings when he is in custody. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966); *Wolfe v. State*, 917 S.W.2d 270, 282 (Tex. Crim.App.1996). A suspect is considered to be in custody when under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest. *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 1528–29, 128 L.Ed.2d 293 (1994); *Nenno v. State*, 970 S.W.2d 549, 556 (Tex.Crim.App.1998). The "reasonable person" standard presupposes an innocent person. *Florida v. Bostick*, 501 U.S. 429, 438, 111 S.Ct. 2382, 2388, 115 L.Ed.2d 389 (1991); *Nenno*, 970 S.W.2d at 556. The subjective intent of the police to arrest the subject is irrelevant unless the police communicated or manifested their intent to the suspect. *Stansbury*, 511 U.S. at 323–24, 114 S.Ct. at 1529–30; *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex.Crim.App.1996).

 Whether a suspect is in custody is determined upon a case-by-case basis. *Dowthitt*, 931 S.W.2d at 255. Police conduct may escalate an initially noncustodial interrogation into a custodial interrogation. *Id.; Stahle v. State*, 970 S.W.2d 682, 690 (Tex.App.—Dallas 1998, pet. ref'd). Stationhouse questioning in and of itself does not constitute custody for the purposes of *Miranda*. *Dowthitt*, 931 S.W.2d at 255; *Stahle*, 970 S.W.2d at 690. The Court of Criminal Appeals has outlined four situations which may constitute custody: (1) when the suspect's freedom of action is physically deprived in any significant way; (2) when a law enforcement officer tells the suspect that he cannot leave; (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave. *Dowthitt*, 931 S.W.2d at 255.

 In the present case, Gonzales was told several times that he was free to leave and that he did not have to answer any questions. It is true after Gonzales gave his incriminating statement there was probable cause for his arrest. However, *Dowthitt* requires more than probable cause in order to create custody for the purposes of Miranda. *Id.* In order for custody to occur, there must be probable cause *and* other circumstances that would lead a reasonable person to believe that he is under restraint to the degree associated with arrest. *Id.* That is not the case here. In fact, after Gonzales signed his statement, Dahl and Ransom released him and allowed him to leave the sheriff's office. Gonzales was not in custody and therefore, was not entitled to the protections afforded under *Miranda*.

The trial court heard the witnesses and was in the best position to judge their credibility and the weight to be given their testimony. Thus we must accept the trial court's determination that Dahl did not promise Gonzales that he could go home if he signed his statement and that Ransom did not take advantage of Gonzales and induce an illegal confession from him. Because we afford almost total deference to

5. We do not address whether Ransom was imputed to know that Gonzales allegedly had a low intelligence because Gonzales was a student in his wife's special education class.

the trial court's determinations and our review of the record supports the trial court's ruling, we hold that the trial court did not abuse its discretion.

We overrule Gonzales' second issue.

## STATE'S WITNESSES' TESTIMONY

Gonzales' third issue claims that the trial court erred in allowing Celia Hirschenhofer, a witness not on the State's witness list, to testify during the State's case-in-chief. Gonzales claims that Hirschenhofer's testimony constituted an unfair surprise because she was not listed as a possible witness on the State's witness list. Gonzales further claims under this issue that the trial court erred when it allowed the State's expert witness, Dr. Leah Lamb, to testify as an expert because she was not qualified to do so.

■ After a lunch recess, the State informed Gonzales that it had just subpoenaed Celia Hirschenhofer, a Human Resources Manager at James Hardie Building Products, Gonzales' place of employment, to testify in response to Gonzales' claims of low intelligence. Gonzales objected on the grounds that this witness was not listed on the State's witness list. The State responded that its decision to call Hirschenhofer was made only *after* it heard the cross-examination testimony of Dahl and Ransom and that it notified Gonzales as soon as was practical after it decided to subpoena Hirschenhofer. The trial court overruled Gonzales' objection.

■ Upon the defendant's request, the State shall give notice of its witnesses. *Martinez v. State*, 867 S.W.2d 30, 39 (Tex. Crim.App.1993). When the trial court allows a witness who is not listed on the State's witness list to testify, we review the trial court's decision under an abuse of discretion standard. *Nobles v. State*, 843 S.W.2d 503, 514 (Tex.Crim.App.1992);

*Campbell v. State*, 900 S.W.2d 763, 772 (Tex.App.—Waco 1995, no pet.). The two factors we consider when determining whether the trial court abused its discretion are: (1) whether the prosecutor's actions in not disclosing the witness ahead of time were in bad faith and (2) whether the defendant could have reasonably anticipated the witness' testimony, although the witness' name was not included on the witness list. *Martinez*, 867 S.W.2d at 39; *Nobles*, 843 S.W.2d at 514–15.

Gonzales failed to show that the State acted in bad faith when it failed to disclose Hirschenhofer as a potential witness. The State testified that it decided to call Hirschenhofer only *after* Gonzales' cross-examination of Dahl and Ransom. The State notified Gonzales that it had subpoenaed Hirschenhofer as soon as it could.[6] Consequently, the State did not act in bad faith and we hold that the trial court did not abuse its discretion when it allowed Hirschenhofer to testify.

■ Gonzales further claims that the trial court erred in allowing the State's expert witness, Dr. Leah Lamb, to testify on the propensity of child victims of sexual assault to recant because she is not a psychologist or a psychiatrist and because she did not have any prior contact with the victim.

■ Under Rule of Evidence 702, before the trial court admits expert testimony, it must be satisfied that three conditions are present: (1) that the witness qualifies as an expert by reason of her knowledge, skill, experience, training, or education; (2) that the subject matter of the testimony is an appropriate one for expert testimony; and (3) that admitting the expert testimony will actually assist the factfinder in deciding the case. Tex.R. Evid. 702; *Alvarado v. State*, 912 S.W.2d 199, 215–16 (Tex.Crim.App.1995); *Campos*

6. Gonzales failed to ask for a continuance in order to prepare for Hirschenhofer's testimony. The failure to object or move for a continuance when a witness who is not listed on the State's witness list is allowed to testify renders the error "harmless." *Barnes v. State*, 876 S.W.2d 316, 328 (Tex.Crim.App. 1994).

*v. State*, 977 S.W.2d 458, 462 (Tex.App.—Waco 1998, no pet.). The trial court's determination regarding experts' qualifications and the admissibility of expert testimony is subject to an abuse of discretion standard of review. *Lagrone v. State*, 942 S.W.2d 602, 616 (Tex.Crim.App.1997); *Alvarado*, 912 S.W.2d at 216. "No rigid formula exists" when a trial court determines whether a particular witness qualifies as an expert. *Matson v. State*, 819 S.W.2d 839, 851 n. 10 (Tex.Crim.App.1991). An expert witness' knowledge or experience about a relevant issue must only exceed that of an average juror. *Bui v. State*, 964 S.W.2d 335, 344 (Tex.App.—Texarkana 1998, pet. ref'd).

Dr. Lamb is a board-certified pediatric physician and the Program Director of the Child Advocacy Resource and Evaluation Team (C.A.R.E.) at Cook Children's Medical Center in Fort Worth, Texas. C.A.R.E. is a child abuse evaluation unit that performs evaluations for different law enforcement agencies, C.P.S., and other hospitals. Dr. Lamb also serves as an assistant professor of pediatrics at the University of North Texas and trains medical students, interns, and residents at John Peter Smith Hospital. Dr. Lamb completed her internship, residency, advanced studies, and post-op studies in child abuse at Los Angeles County Hospital. While at Los Angeles County Hospital, Dr. Lamb trained under an internationally known expert on child sexual abuse and viewed approximately 800 child abuse cases and performed approximately 100 child abuse exams. Based upon Dr. Lamb's extensive background, experience, and expertise on child abuse issues, we hold that the trial court did not abuse its discretion when it qualified Dr. Lamb as an expert witness.

▆▆▆ Gonzales further claims that the trial court erred when it allowed Dr. Lamb to testify because her testimony that E.B. was acting in conformity with Child Sexual Abuse Accommodation Syndrome, was in essence testimony concerning E.B.'s truthfulness and thus, was not admissible. Gonzales also claims that because Dr. Lamb did not personally examine E.B., it was error for the trial court to allow her to testify.

▆▆▆ An expert witness may testify if her scientific, technical, or other specialized knowledge will assist the jury in determining a fact issue. TEX.R. EVID. 702. However, an expert witness' testimony must aid the jury and not supplant its determination. TEX.R. EVID. 704; *Schutz v. State*, 957 S.W.2d 52, 59 (Tex.Crim.App. 1997). Expert witness testimony concerning child sexual abuse does not aid the jury when it constitutes a direct opinion on the child victim's truthfulness and in essence, decides an ultimate fact issue for the jury. *Id.; Yount v. State*, 872 S.W.2d 706, 708 (Tex.Crim.App.1993). Expert witness testimony should only be admitted when it is helpful to the jury and limited to situations in which the expert's knowledge and experience on a relevant issue are beyond that of an average juror. *Williams v. State*, 895 S.W.2d 363, 366 (Tex.Crim.App.1994); *Yount*, 872 S.W.2d at 710–11 (citing *Duckett v. State*, 797 S.W.2d 906, 914 (Tex.Crim.App.1990)). Expert witness testimony that a child victim exhibits elements or characteristics that have been empirically shown to be common among sexually abused children is relevant and admissible under Rule 702 because it is specialized knowledge that is helpful to the jury. *Duckett*, 797 S.W.2d at 920; *Vasquez v. State*, 975 S.W.2d 415, 417 (Tex.App.—Austin 1998, pet. ref'd); *Decker v. State*, 894 S.W.2d 475, 479 (Tex. App.—Austin 1995, pet. ref'd).

▆▆▆ Further, an expert witness may give testimony based upon hypothetical questions posed to her during trial. *Jordan v. State*, 928 S.W.2d 550, 556 n. 8 (Tex.Crim.App.1996); *McBride v. State*, 862 S.W.2d 600, 610 (Tex.Crim.App.1993); *Moore v. State*, 836 S.W.2d 255, 259 (Tex. App.—Texarkana 1992, pet. ref'd). The hypothetical questions must be based upon

facts in evidence, facts within the personal knowledge of the witness, or facts assumed from common or judicial knowledge. *McBride*, 862 S.W.2d at 610; *Pyles v. State*, 755 S.W.2d 98, 118 (Tex.Crim.App. 1988); *Held v. State*, 948 S.W.2d 45, 53 (Tex.App.—Houston [14th Dist.] 1997, pet. ref'd). Further, the State may propound hypothetical questions that assume facts in accordance with its theory of the case. *McBride*, 862 S.W.2d at 610 n. 20; *Pyles*, 755 S.W.2d at 118; *Held*, 948 S.W.2d at 53.

Dr. Lamb testified about Child Sexual Abuse Accommodation Syndrome, a description of the interaction and dynamics that occur after a child has been sexually abused. Dr. Lamb testified that this syndrome is well-accepted. Dr. Lamb stated that according to Child Sexual Abuse Accommodation Syndrome, child sexual abuse victims may make disclosures or try to tell someone about the sexual abuse. Dr. Lamb further stated that after the child victim discloses the abuse, that child may recant or deny the allegations. She testified that many times after a child makes allegations of sexual abuse, the family breaks apart and that the child victim feels responsible. According to Dr. Lamb under Child Sexual Abuse Accommodation Syndrome, some child victims recant their allegations because of the considerable pressure placed on them by their family.

The State then asked Dr. Lamb several hypothetical questions, based upon the facts admitted into evidence. In one hypothetical, the State asked Dr. Lamb if a child sexual abuse victim, whose half-sister is married to the sexual abuser and whose half-sister is financially dependent upon the sexual abuser, might recant his or her sexual abuse allegations. Dr. Lamb replied that it would depend upon whether the child victim's parents believed and supported the child victim and the age of the child victim. The State then posed the hypothetical to Dr. Lamb that if the child victim has little or no family support and the family's financial situation was in desperate straits, would this place great pres-

sure on the child victim. Dr. Lamb stated that it would and that a child victim in this situation might be likely to retract or recant her sexual abuse allegations.

Dr. Lamb testified about the typical behavior patterns of child sexual abuse victims and explained why, according to Child Sexual Abuse Accommodation Syndrome, child sexual abuse victims may recant their allegations of sexual abuse. Dr. Lamb did not testify as to E.B.'s conformity with Child Sexual Abuse Accommodation Syndrome, nor did she express an opinion as to the truthfulness of E.B.'s allegations and subsequent denials of sexual abuse. Rather, Dr. Lamb answered the State's hypothetical questions that were based upon the facts admitted into evidence. Dr. Lamb's testimony did not concern the truthfulness of E.B., did not decide an ultimate fact issue for the jury, and was helpful to the jury.

■ Further, there is no requirement that an expert witness personally interview the victim for her testimony to be admissible. *See* Tex.R. Evid. 703 (facts or data of a particular case upon which expert bases opinion may be those ... made known to the expert). The Court of Criminal Appeals has held that the preferred practice for a child sexual abuse testifying expert witness is no personal examination of the child victim. *Duckett*, 797 S.W.2d at 920 n. 18. The Court reasoned that this practice ensures that the expert witness' testimony will not be tainted by her personal reference to the credibility of the child victim's claims and her testimony will not decide an ultimate fact issue. *Id.*

For these reasons, we find that the trial court did not abuse its discretion when it allowed Dr. Lamb to testify. We overrule Gonzales' third issue.

We affirm the judgment of the trial court.

CUMMINGS, J., not participating.