# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00467-CV

**Mark Rodriguez and Carmen Rodriguez, Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

**FROM THE DISTRICT COURT OF CALDWELL COUNTY, 421ST JUDICIAL DISTRICT
NO. 06-FL-018, HONORABLE TODD A. BLOMERTH, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Mark Rodriguez and Carmen Rodriguez appeal from the final order in this suit affecting the parent-child relationship with their daughter, B. R.[1] The order appointed the Department of Family and Protective Services (FPS) as the permanent managing conservator and appointed both appellants as possessory conservators with limited visitation rights. Appellants complain that the trial court relied on hearsay, as well as fraudulent and unsubstantiated evidence. They also assert that the court made erroneous decisions and incorrectly required Mark Rodriguez to undergo sex offender therapy. We affirm.

The record on appeal consists only of the clerk's record. Appellants did not request the preparation of a reporter's record. They assert that no reporter was present during the final set of hearings, but that the judge presiding recorded proceedings on her laptop computer. Appellants

---

[1] Appellants proceeded pro se in the trial court and appear pro se on appeal.

assert that the clerk's record provides adequate evidence to support their complaints, rejecting FPS's argument that the absence of a reporter's record prevents this Court from reversing the order because we cannot review the evidence admitted at the trial.

Appellants also filed a Motion for Appellate Court to Provide Alternatives to Court Reporter's Record if Court Reporter Record is Required by Appellate Court, which this Court denied. In that motion, they asserted that, although they did not request a reporter, the absence of a reporter was a denial of their right to a fair hearing. They asserted that the clerk's office failed to include exhibits as requested.[2] The motion states that, despite the absence of these exhibits:

> Appellants believe there is adequate evidence for the Appeals Court review of the case development, proceedings and conclusions. The undersigned requests that should the Appeals Court mandate a transcript of the final hearing, then the Appellants request either:
>
> - The Appeals Court to utilize the digital recording available from the Caldwell County court or
>
> - Allow the Appellants' discretion on a partial transcription of the final hearing day of the six day trial.

Appellants asserted in the motion that preparation of the full reporter's record would be several thousand dollars and beyond their financial resources.

We overruled appellants' motion because their motion essentially asked this Court to decide for appellants how to pursue this appeal. This Court is a neutral arbiter and cannot direct

---

[2] Exhibits offered or admitted at trial properly accompany the reporter's record and must be requested from the reporter. *See* Tex. R. App. P. 34.6(b)(1).

a party's strategic decisions.[3] Under the rules, appellants have the burden of making many decisions, including what issues to present, what relief to request, what portions of the trial court record to request be included in the record on appeal, and how to craft a brief that best serves their interest. *See* Tex. R. App. P. 34.6(b), 38.1. The appellate court does not "mandate" a reporter's record absent the party's request and the reporter's failure to provide it. Appellants chose not to request the reporter's record, stating that they "believe there is adequate evidence for the Appeals Court review of the case development, proceedings and conclusions." Appellants have chosen to rely on materials in the clerk's record to support their issues presented, as is their prerogative. *See* Tex. R. App. P. 37.3(c).

In the absence of a reporter's record from a bench trial, a court must presume that the omitted proceedings are relevant to and support the trial court's judgment. *Hebisen v. Clear Creek Indep. Sch. Dist.*, 217 S.W.3d 527, 538 (Tex. App.—Houston [14th Dist.] 2006, no pet.). Therefore, this Court must presume that (1) the trial court properly exercised its discretion to hear evidence regarding all of the issues, whether appealed or not, and (2) the trial court heard evidence that is legally sufficient to support its judgment. *Id*. This standard arguably would require that we affirm the final order without further deliberation. However, because of the importance of the rights at stake in this child custody case and because the clerk's record includes statements and affidavits, we will examine the issues presented in light of the documents in the clerk's record.

---

[3] Appellants' pro se status does not affect this Court's role. "Litigants who represent themselves must comply with the applicable procedural rules, or else they would be given an unfair advantage over litigants represented by counsel." *Mansfield State Bank v. Cohn*, 573 S.W.2d 181, 185 (Tex. 1978).

The clerk's record contains statements made to law enforcement by Carmen Rodriguez, appellants' children, and a neighbor about specific incidents and general conditions in the Rodriguez home. The taking of statements was apparently prompted by a report to a neighbor by appellants' 19-year-old daughter, J. R., of severe neglect, sexual and physical abuse, and long-term physical and emotional isolation. Authorities were contacted, and the family gave written statements.

In a statement dated January 8, 2006, Carmen recounted an incident in July 2003 in which "Mark was trying to hurt [her older daughters] and [an older son] was protecting [them]. . . . Mark is a violent person and frequently emotionally abusive. I did not know he was molesting my daughter [J. R.] until today."

According to their 25-year-old daughter, Monique, Mark "forces himself" on female family members, which she describes by saying "his presence makes [the girls in the family] and my mom uncomfortable and he will not leave them alone." The altercation Carmen recounted was, according to Monique's statement, prompted by Mark's increasingly heated inquiries into credit card balances. She also reported that "yesterday, January 7, 2005, I found out that [sisters J. R., C. R., and B. R.] were asked by Mark to take off their clothes so he can take pictures of them naked."[4]

Appellants' 28-year-old son, Lorran, corroborated the story about the credit card altercation. He added the detail that, before the altercation, Mark was angry because a friend of

---

[4] The 2005 date noted in the statement appears to be an error. The statement was dated January 8, 2006.

4

Carmen's—who Mark believed was advising her to divorce Mark—had called the house. Lorran also recounted an incident in which Mark asked Lorran and a sibling to get a gun and shoot him. Lorran said that J. R. told him that Mark tried to get the sisters to take nude photographs. Lorran said that his grandmother feared that Mark was going to hurt the remaining children if they stayed with him.

Appellants' 24-year-old daughter, Chantre, gave her account of the credit card altercation. She did not remember the details of the conversation, but she did recall Mark's anger and the tension as their brother attempted to block Mark's path to the daughters' room. She recalled getting between the men and preventing a physical struggle.

Appellants' 21-year-old son, Einnar, stated that Mark showed the three youngest sisters a pornographic magazine in 2000. He also wrote that Mark "reportedly molested them according to my 3 youngest sisters." Einnar stated that Mark tried to get the girls to join a strip club so that Mark could quit his job.

J. R. wrote that Mark physically abused her and her mother and "had been into child pornograp[hy] and molesting children as far back as I remember." She also stated that she and her siblings were victims. She wrote that she had been "forced to do sexual acts with" Mark "since I was 8-16 years old." She stated that he threatened her when she questioned their activities and became violent when she asked him to stop. She also recounted an incident in 2000 during which Mark drove her and her sisters to an isolated area, tied them down, and molested them individually. She wrote about more sexual assaults on her that occurred in 2001. She said that she eventually demanded that he stop, which he did, but that she stayed in the home to protect her sisters.

5

Nevertheless, J. R. stated that Mark "started taking my two younger sisters alone in the van [he] currently has, I suspected he was abusing or molesting them because they would come back fearful & upset, soon later had suicidal thoughts & talk." Her account of the July 2003 incident included her memory that Mark threatened them with a shotgun. She stated, "This man has certainly the stalke[r] personality, that's why all fear him or reporting for help, it needs t[o] stop for my family's sake as well [as] others who are in danger, possibly other children."

Appellants' then-16-year-old daughter, C. R., confirmed that, six years earlier, Mark asked her and her sisters to pose nude for photographs so they could be rich. She testified that, in 2001, she and her siblings opened Mark's bag and found a magazine with pornographic images of 12-year-old girls. Mark was angry when he found the children and yelled at them. He yelled at J. R. and asked her "What did you see?" When she did not answer, he shook her and threw her down. She also recalled the July 2003 altercation, but did not recount a discussion preceding it. She did write that Mark yelled and was choking Lorran, then that Lorran began choking Mark. C. R. also recounted seeing Mark try to touch J. R.'s breast once while he was driving and J. R. was seated next to him in the front seat, and another time while they were watching a movie at home. C. R. stated that she did not see such behavior at other times but that J. R. "has told me it has happened more."

These allegations prompted authorities to arrest Mark for sexual assault and to ask further questions. Carmen stated that she did not believe J. R.'s accusations of sexual assault. Based on the initial allegations and Carmen's refusal to believe them, FPS removed the then-minor children—16-year-old C. R. and 13-year-old B. R.—from the parents' home.

Family members, including Mark and J. R., filed affidavits in February 2006 that explain, modify, or retract the statements they gave in January 2006.

Mark denied or explained why the allegations in the family's January statements did not support removal of the remaining minor children. He asserted that he did not fit the profile of a sexual abuser and that J. R. did not exhibit behaviors of a victim. He said that she demanded a lot of attention and persuaded the other girls to lie about him on January 7, 2006. He asserted that J. R.'s statement tracked the family code statutes as if a checklist had been used when neighbors assisted her in preparing her statement. Mark said that the July 2003 altercation was the result of financial and marital stress, that no gun was involved, that no choking or fistfight occurred, and that it was simply a wrestling match that was over in a few minutes. He said that the magazine that C. R. reported finding in his bag was not child pornography because that is illegal and not obtainable at the New Braunfels convenience store where the magazine was purchased, and that the photo was of a subject with a child-like face. Mark contended that the allegations were not supported by a preponderance of evidence and did not support removal of the children.

In Carmen's affidavit, she averred that she never saw J. R. show behaviors typical of abuse victims. Carmen is a registered nurse. She asserted that J. R. is outgoing and has a good relationship with Mark. Carmen stated that she did not know what to say in her written statement, but that the detective who questioned her and her family for five hours insisted that they put something down. She said that her statement that "'[h]e is a violent person' refers to the incident when he damaged a dog kennel during a temper flare up when my daughter [J. R.] disrespectfully said Mark 'ate like a pig' on his birthday in April 2002." Otherwise, she had not seen him be

violent. Her statement that Mark was "frequently emotionally abusive" referred only to his insistence on remaining married despite her "constantly asking for us to separate." Since their debts had been discharged in bankruptcy in January 2006, she said the stress had eased and she believed their marriage could work.

Lorran filed an affidavit in which he denied that Mark ever pointed a gun at anyone. He said he had never seen pornography in their house, their vehicle, or computers, nor had he seen Mark naked. He said he generally tends to disregard his grandmother's statements as outlandish. He corroborated Mark's version of the July 2003 altercation as being overreactions by him and his father, and said that no weapons, choking, punching, fist fighting or kicking was involved. Lorran said that, since J. R. told him about Mark's request that the girls be photographed nude, he had watched their interactions. He said he had noticed no unusual or inappropriate affection or conversation between Mark and J. R. Lorran said that J. R. demands attention and is prone to lying. He recounted several of J. R.'s outbursts, including one in which her father was repairing a shower, and J. R. began throwing his tools and screaming "get out," claiming that Mark had beat her cat with tools; Lorran found the cat uninjured. Lorran said that once, when J. R.'s bike got a flat tire, she refused his offer of a ride home, claiming that he had "summoned devils out to cause her tire to go flat."

Monique also elaborated on her statement. She said she mentioned the July 2003 altercation because the detective "insisted we put something down on paper or it would look suspicious." When she said her mother received most of the emotional abuse, she meant that Mark is very persistent about wanting to talk problems out, in contrast to Carmen, who does not like to talk

8

when she is upset.  Monique wrote that massive credit card debt was a source of tension.  She wrote that her statement that Mark "forces himself on the girls" referred to his persistence in maintaining communication and his desire to spend time with them on his days off.  She said she had never seen him with pornography and had never heard the accusations about his desire to take nude photographs of the younger girls before January 2006.

Chantre also averred that she wrote something down in her statement just to appease the detective.  She added that Mark never threatened them with a gun.  She denied ever seeing her sisters with unexplained injuries.  She said that J. R. was always very vocal and would have complained had something been wrong.  Chantre wrote that J. R. was very emotional and susceptible to uncontrolled emotional outbursts over trivial events.  Chantre wrote that she had never seen or heard any sexual abuse and had not seen her father naked.

J. R. later filed an affidavit in which she recanted all of her accusations.  She described in great detail how she used the opportunity provided by her neighbor's belief that abuse was occurring in the house as a way to get Mark to stop looking at pornography.  She said that her neighbor was obsessed with her family and believed that God had sent her to protect the Rodriguez children—to the extent that she had moved from another town at the insistence of audible disembodied voices.  J. R. stated that she embellished the facts by alleging that her father's pornography was of children, by inventing the allegation that he wanted to take nude photographs of her and her sisters, and by inventing the allegation that he sexually abused her.  She averred that she made up these allegations hoping to shock her father into renouncing pornography.  She stated that she had been manipulated by others and that, when she realized the true effect of her false

9

allegations, she regretted and recanted them. She stated that her neighbor threatened that God would reject J. R. if she recanted her testimony.

Carmen later filed a complaint with the Texas Department of State Health Services regarding actions by licensed substance abuse counselor Carrie Roper. Carmen asserted that Roper conspired with her neighbor to persuade J. R. that she had repressed memories of sexual abuse. Carmen also asserted that Roper's giving J. R. a book on the theory of repressed memories as well as associated counseling, violated state licensure laws barring counseling personal friends.

Carmen filed a complaint with the Texas State Board of Medical Examiners that her father-in-law, Dr. J. A. Rodriguez, violated his professional responsibilities and duties prompted by his interaction with J. R. According to the complaint, Dr. Rodriguez is an 81-year-old retired physician who received e-mails from J. R. in which she claimed Mark had physically and sexually abused her. Carmen complained that, instead of reporting the allegations of abuse to authorities or to the family, Dr. Rodriguez corresponded with J. R., "diagnosing Mark (via what [J. R.] said in her e-mails) as being 'mentally ill', 'he will kill someone if he gets into a rage' and 'I am afraid for the safety of the family.'" Carmen then reported that Dr. Rodriguez disagreed with their choice to home-school their children and had not maintained regular communication with the family during her marriage to Mark. She asserted that Dr. Rodriguez changed his views of J. R. when he learned that J. R was making some sort of allegations against him, deeming J. R. "'bipolar', 'paranoid schizophrenic', and 'crazy' and 'if you let her back in your house watch your back because she will put a knife in your chest.'" Carmen complained that Dr. Rodriguez engaged in unprofessional

conduct in his e-mail communications with J. R. and violated his duty to report J. R.'s allegations if he believed them.

A service plan was adopted that allowed the girls to live at home with their mother, provided they had no contact with the males in the family. The plan required that the parents attend various types of classes and counseling, which they did. After finding that appellants had violated the court's requirement that they not discuss the case with their children, the court removed the children from their mother's home and directed FPS to place them. The males in the family were then permitted to return to the family's home. A subsequent order prohibited Mark from having contact with the two girls.[5] Before the final hearing, C. R. turned eighteen and was no longer a subject of this proceeding. Each appellant had legal counsel who were later allowed to withdraw because appellants no longer wished to retain them.

The final order under appeal here establishes FPS as the permanent managing conservator for B. R., naming appellants possessory conservators. The order permits Carmen to have weekly supervised visits with B. R. as well as unsupervised visits "upon the recommendation of a therapist. Mrs. Rodriguez may choose the therapist." The order permits Mark to have supervised visits with B. R. "until the criminal case is resolved. Once his criminal case is resolved he may continue to have supervised visits only if he attends sex offender therapy." According to appellants, the criminal charges against Mark were dismissed two days after the final hearing in this case.

---

[5] Appellants asserted in their status report that this change was the result of Mark taking a polygraph examination at which the examiner determined there was deception indicated. Appellants contended that the result was due to Mark's anxiety when placed in unfamiliar processes or situations akin to being in a dentist's chair, which he finds difficult.

Appellants present several issues. They contend that the trial court erred by (1) relying heavily on hearsay, conjecture, and unsupported evidence, (2) using only fraudulent, selective evidence, (3) validating FPS's actions in removing the children without a court order or following proper procedures, (4) determining that Carmen failed to supervise and was not protective without establishing that abuse occurred, (5) requiring Mark to undergo sex offender therapy, and (6) relying heavily on the report by FPS's expert, Matthew Ferrara, which they allege was based solely on conclusions relying on the veracity of J. R.'s original accusations.

In their first issue, appellants complain that "hearsay was the major part of the evidence presented in the form of emails, perjured testimony, suppressed documents and unsupported accusations against the appellants." We do not know what documents were admitted as evidence during the trial. Nevertheless, we find no error if the evidence complained of was the documents in the clerk's record. The rules of evidence provide that error cannot be shown in a ruling admitting or excluding evidence unless "a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context" or, "[i]n case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer, or was apparent from the context within which questions were asked." *See* Tex. R. Evid. 103(a). The rules of appellate procedure similarly require the following:

> As a prerequisite to presenting a complaint for appellate review, the record must show that:
>
> (1) the complaint was made to the trial court by a timely request, objection, or motion that:

12

(A) stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context; and

(B) complied with the requirements of the Texas Rules of Civil or Criminal Evidence or the Texas Rules of Civil or Appellate Procedure; and

(2) the trial court:

(A) ruled on the request, objection, or motion, either expressly or implicitly; or

(B) refused to rule on the request, objection, or motion, and the complaining party objected to the refusal.

Tex. R. App. P. 33.1(a). The record before us does not contain any objections to the evidence. We find no indication that evidence was suppressed, or that suppressed evidence was considered. Whether evidence is credible or supported generally affects the weight accorded the evidence. For the court to be required to entirely disregard evidence, an objection or other means of exclusion had to be made. No error is shown by the court's consideration of unobjected-to evidence.

In their second issue, appellants contend that "fraudulent evidence was used to fundamentally deny fair procedures before child removal, a right included in procedural due process." The substance of the argument in their brief pertains to FPS's use of evidence derived from J. R.'s original accusations that Mark sexually assaulted her, even though she later recanted those accusations. Appellants contend that suppression by the prosecution of material evidence that is favorable to an accused violates due process, as does a prosecutor's knowing presentation of false testimony or failure to correct testimony he knows is false. This is not a prosecution, however, and more to the point, the record before us does not demonstrate that J. R.'s statements recanting her

13

January statements were suppressed, that FPS's attorney knew that J. R.'s original accusation was false, or that the original accusation is necessarily false. At least one of J. R.'s contrary statements, her affidavit dated June 8, 2006, is in the clerk's record. More may have been admitted at trial, but we do not have that record before us. Recantation of an earlier statement—however forceful or repeated—does not necessarily make the earlier statement false. The recantation itself may be false.[6] The resolution of the contradiction is a credibility issue for the factfinder. The Department did not commit fraud or violate anyone's rights merely by offering a recanted statement and, on this record, the court did not err by admitting or considering it.

In their third issue, appellants contend that "the Fourth Amendment was violated (among many others) since there was no probable cause established for child removal." Appellants complain that FPS did not conduct a sufficiently thorough investigation before removing C. R. and B. R. from their home.[7] Appellants assert that FPS lacked probable cause to seize the children on January 11, 2006, and that there was no evidence the children were in imminent danger. It is not entirely clear how the evidentiary basis for the initial removal relates to any alleged error in the final order rendered after a full hearing. Nevertheless, we will examine whether FPS had any sound basis for removing the children on January 11, 2006.

---

[6] While the premise that a recantation, rather than the original statement, may be false is self-evident, it has been noted that child victims of familial sexual assault may feel unique pressure to make a false recantation. See Gonzales v. State, 4 S.W.3d 406, 418 (Tex. App.—Waco 1999, no pet.).

[7] Appellants also assert that the removal deprived the children of due process under the Fifth and Fourteenth Amendments. The children are not named parties to this appeal and their rights cannot be asserted by the parents as individuals, which is the only way that appellants have appealed.

A qualified person can remove children without a court order under limited circumstances, including based "on information furnished by another that has been corroborated by personal knowledge of facts and all of which taken together would lead a person of ordinary prudence and caution to believe that" either "there is an immediate danger to the physical health or safety of the child" or "that the child has been the victim of sexual abuse." Tex. Fam. Code Ann. § 262.104(a) (West Supp. 2007). In statements to a Caldwell County Sheriff's Office investigator dated January 8, 2006, the family members recounted or reported hearing of incidents of Mark making threats, physically assaulting one child, encouraging then-minor girls to pose nude for pictures, and sexually abusing at least one girl. In her affidavit in support of FPS's original petition, filed January 13, 2006, FPS specialist Marijo Shearin recounted the statements the family had given, supplemented by additional reports of abuse and statements taken from the younger daughters in interviews at the children's advocacy center. Shearin also reported that, on January 11, 2006, Carmen reported that she had posted bond for Mark after his arrest for sexual assault and stated that she did not believe J. R.'s accusations of sexual abuse. Shearin concluded that there was an immediate danger to the children in the home because of the reported abuse by Mark and his probable imminent return to the home. The information Shearin described in her affidavit does not appear materially different from the information she had on January 11, 2006, when she made the decision to remove the children from the home. We conclude that appellants have not shown error in the initial removal requiring reversal of the trial court's final order.

In their fourth issue, appellants contend that, "without established abuse, there can be no failure to supervise and protect." This appears to be a challenge to the sufficiency of the

15

evidence to support the trial court's decision not to name Carmen as a managing conservator and specifically references the failure to establish sexual abuse by Mark. They also argue that Caldwell County unlawfully suppressed J. R.'s affidavit of nonprosecution and petition to rescind a fraudulently obtained protective order.

The primary consideration in conservatorship cases is the best interest of the child. Tex. Fam. Code Ann. § 153.002 (West 2002). A parent (or both parents) will be appointed sole (or joint) managing conservator "unless the court finds that the appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development." *Id*. § 153.131(a). FPS's burden of proof is preponderance of the evidence. *Id*. § 105.005; *see also In re W.M.*, 172 S.W.3d 718, 724 (Tex. App.—Fort Worth 2005, no pet.). The standard of review for determinations of a child's best interest and conservatorship is abuse of discretion. *Id*. An abuse of discretion occurs only when the court acts arbitrarily, unreasonably, or without regard to guiding rules and principles. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990).

The record before us does not demonstrate that the trial court abused its discretion by refusing to make Carmen a managing conservator. The trial court was required to assess the best interest of the child, not merely whether Mark sexually abused one of the daughters and Carmen ignored it. We do not know what evidence was admitted at trial. The clerk's record contains the original statements from the family and others discussing various incidents of emotional, physical, and sexual abuse. It also contains reports that Carmen rejected J. R.'s accusations. The record also contains affidavits from family members explaining, contradicting, or withdrawing their original

16

statements. Where conflicting evidence is in the record, the trial court as factfinder must resolve the conflict. *Great Am. Ins. Co. v. Murray*, 437 S.W.2d 264, 266 (Tex. 1969); *Intec Sys., Inc. v. Lowrey*, 230 S.W.3d 913, 920 (Tex. App.—Dallas 2007, no pet.). We must defer to the factfinder's credibility determinations, particularly when custody is at issue. *See Sotelo v. Gonzales*, 170 S.W.3d 783, 789 (Tex. App.—El Paso 2005, no pet.); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). On the record presented to us, we cannot say that the trial court abused its discretion when determining from the evidence before it that the best interest of the child was better served by not having her parents as managing conservators.

In their sixth issue, appellants contend that "Dr. Matthew Ferrara's findings, conclusions and recommendations are not valid since they were based on outcry victim's false allegations of sexual abuse which are unsupported by medical evidence." This issue apparently relates to the sufficiency of the evidence underlying the trial court's order because the trial court ordered that B. R. "NOT be placed with her parents unless recommended by Dr. Matthew Ferrara." Appellants do not cite this Court to a report by Dr. Ferrara in the record. Appellants assert that, in late 2006, Dr. Ferrara strongly recommended sex offender treatment for Mark as an assurance that he is safe with children. Appellants assert that this report did not refer to the later affidavits or motions by J. R. and others contradicting the initial claims of sexual and other abuse. Appellants also assert that Dr. Ferrara strongly encouraged Mark to take a polygraph examination, after which the administrator opined that Mark's performance indicated deception—though about what precisely the record is not clear. In addition to attacking the reliability of polygraphs, appellants contend that Mark suffered an anxiety or panic attack from the administration of the test. He also contends that

17

FPS workers used psycho-sexual evaluation tools on him that are not appropriate for persons who have not admitted guilt. We cannot evaluate the validity of Dr. Ferrara's findings on the record before us. As we have concluded above, without reference to Dr. Ferrara's findings, the record before us does not show an abuse of discretion in the court's conservatorship decision. Even if Dr. Ferrara's findings are flawed, reliance on them would not necessarily show reversible error.

In their fifth issue, appellants assert that, "since the father did not abuse the child as established by lack of objective findings, requiring the father to make an admission by court ordered sex offender therapy would be asking the father to lie and commit perjury." Appellants argue that Mark is being placed in the untenable position of remaining silent in court-ordered therapy, resulting in the loss of his child, or falsely confessing to abuse, resulting in a loss of liberty. He equates this to court-ordered confession. We do not agree that attending therapy is equivalent to an admission that he has committed abuse. Mark is not being prosecuted for sexual assault and the conservatorship decision has been made without any express finding regarding sexual abuse. There is no showing that the court-ordered therapy requires that Mark confess to sexual abuse. The therapist may instead conclude that Mark did not commit any sexual abuse and, with Mark's permission, inform the trial court of that conclusion. In any event, Mark could not commit perjury in his therapy sessions because he would not be under oath or an inmate making an unsworn declaration. *See* Tex. Penal Code Ann. § 37.02 (West 2003) (defining perjury). Appellants' fifth issue does not present reversible error.

We affirm the trial court's order.

_____

G. Alan Waldrop, Justice

Before Chief Justice Law, Justices Pemberton and Waldrop

Affirmed

Filed:   May 8, 2008