# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-04-00359-CR

---

**Bruce Gordon Hatter, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE DISTRICT COURT OF LLANO COUNTY, 33RD JUDICIAL DISTRICT
NO. CR5425, HONORABLE LLOYD DOUGLAS SHAVER, JUDGE PRESIDING**

---

### M E M O R A N D U M   O P I N I O N

A jury found appellant, Bruce Gordon Hatter, guilty of the offenses of injury to a child, aggravated sexual assault of a child, sexual assault of a child, and indecency with a child. *See* Tex. Pen. Code Ann. §§ 22.04 (injury to a child), 22.021(a)(1)(B) (aggravated sexual assault of a child), 22.011(a)(2) (sexual assault of a child), 21.11 (indecency with a child) (West 2003 & Supp. 2005). Hatter asserts that the district court erred in admitting expert testimony regarding sadism and in not allowing Hatter's counsel to ask two of the victims certain questions during cross-examination concerning prior criminal charges and previous sexual conduct. We will affirm the judgment of the district court.

## BACKGROUND

The jury heard evidence that on the morning of August 21, 2003, three teenagers (referred to throughout trial as A, B, and C) walked over to Hatter's house. It is unclear from the record how the teenagers knew Hatter, a 48-year-old man, although there is some evidence that Hatter had a relationship with C's mother. A and C were 14-year-old boys and B was a 15-year-old girl. The three teenagers testified that they were good friends with each other, and C testified that Hatter had offered to give them a ride to school that day.

The teenagers testified that once they arrived at Hatter's house, they noticed that Hatter had been drinking alcohol. According to the teenagers, Hatter invited them inside, and soon they were drinking alcohol with him. The teenagers testified that they became intoxicated.

C testified that while he and A were in the living room watching television, Hatter and B went into the bedroom. C testified that he looked into the bedroom and saw Hatter having "oral sex" with B, who was "just lying there," "had all of her clothes off," and didn't "seem like she was happy." C then testified that, after Hatter had sex with B, Hatter told A and C to have sex with B. A and C both testified that they did but that they didn't want to.

C testified that after he and A had sex with B, Hatter put handcuffs on A and C. C also testified that Hatter put a "clothespin on [A's] genitalia" and on "his stomach and stuff" as well as "nipple clamps with a chain attached to it." C further testified that Hatter "grabbed [A's] penis and pinched it." C also testified that Hatter tried to put clamps and clothespins on him, but that C prevented him from doing so by "kicking in the air to try and hit his hands." On cross-examination, C testified that Hatter said "that if we told anybody about what happened that day, he would kill us."

2

A testified that he saw Hatter taking B's clothes off in the bedroom and "kissing on her and stuff." A also testified that Hatter told him to have sex with B, and that "he would knock [A] through the wall if it didn't happen." A stated that he had sex with B, but he testified that as he did so, it looked like B was upset, so he stopped. A also testified that later in the day, when Hatter was "messing with" B again, A told Hatter to "back off because she was not liking it." A testified that this made Hatter mad and that Hatter first hit him, then grabbed him and "twisted" his penis. A also described what happened when Hatter handcuffed him:

Q: So could you describe for us how you were handcuffed?

A: My hands were up over my head. I was sitting in the chair. I was handcuffed to a two-by-four coming up.

Q: Was that a wall in the bedroom?

A: Yes, ma'am.

Q: And what did you have on?

A: Nothing, I believe.

. . . .

Q: And at what point did you see these [nipple clamps]?

A: Whenever I was handcuffed.

Q: Tell us what happened.

A: They were put on me.

Q: And if you would, could you tell us where?

A: On my nipple.

3

Q: And did that hurt?

A: Yes, ma'am.

Q: What were you doing when that was happening?

A: I was handcuffed, and I was telling him to stop.

Q: Did he do anything with regard to your penis?

A: Yes, ma'am.

Q: Can you tell us about that?

A: He put a clothespin on my nut sack.

. . . .

Q: At that time, was there any way that you could fight off the defendant?

A: I tried.

The jury also heard evidence that A was screaming and crying during the incident.

The final teenager to testify was B, who had difficulty explaining what Hatter did to her:

Q: And then what did Bruce do?

A: He touched me in certain places.

Q: Did you have any clothes on at the time?

A: No, ma'am.

Q: Who took your clothes off?

A: I don't remember.

Q: Did you take them off, or you don't know?

A: I don't know.

Q: Were you on the bed?

A: Yes, ma'am.

Q: Did Bruce have any clothes on?

A: I don't remember.

B also testified that Hatter touched her on her breasts and inserted his finger into her vagina. When the prosecutor asked B if Hatter did anything with his mouth, B became very emotional and had to be excused for the day. When she resumed her testimony the next morning, B testified that Hatter made the boys have sex with her and that she didn't want to.

The teenagers also testified that three women arrived at the house later that day. Hatter's former girlfriend, Sylvia Perez, drove to Hatter's house that afternoon with her two adult daughters, Nauna Hernandez and Jessica Gomez. Perez testified that she did not own a telephone and needed to use Hatter's phone to call her son. Gomez testified that when they arrived at Hatter's house, she went to the front door and knocked. No one answered, and Gomez looked in the window and saw someone running around. Gomez testified that she became concerned and returned to her mother's van, telling her mother and her sister that "something was going on inside the house." Perez and Hernandez got out of the van and approached the house together with Gomez. Gomez testified that Hatter opened the door, wearing only shorts. The three women walked inside and sat down on the couch. They testified that they observed A trying to get dressed; he was wearing nothing but boxer shorts. They also testified to seeing C handcuffed to a wall in Hatter's room and

5

hearing B crying in the bathroom. Gomez testified that she walked to the bathroom and found B naked, saying that "she wanted to go home and that she never wanted to do it again." Gomez walked back into the living room and told her mom about B. A then asked Gomez to help B get dressed. Gomez testified that at this point Hatter became violent towards A, first throwing beer bottles at him and then grabbing him, throwing him against the wall, and repeatedly punching him in the face. Gomez testified that her mother began yelling at Hatter, trying to get him to stop hitting A, which he eventually did. Gomez then asked Hatter to unlock C from his handcuffs, and Hatter attempted to do so, but he was shaking so badly that Gomez had to take the key away from him and unlock the handcuffs herself. After helping B get partially dressed, the women led the teenagers out of Hatter's house. Gomez testified that as B walked past Hatter, he said something to her that caused B to begin crying again. The women and the teenagers got in the van and drove to C's house. Perez testified that she then called the police.

Hatter was charged with four counts of injury to a child, two counts of aggravated sexual assault of a child, two counts of sexual assault of a child, and two counts of indecency with a child. The jury found Hatter guilty of three counts of injury to a child, one count of aggravated sexual assault of a child, two counts of sexual assault of a child, and one count of indecency with a child. The court assessed punishment at twenty-three years' confinement. This appeal followed.

**DISCUSSION**

**Admission of expert testimony**

In his first issue on appeal, Hatter asserts that the district court erred in allowing the State to present expert testimony on the issue of sadism. Hatter asserts that sadism was not relevant

6

to the State's case because it was not an element of any of the offenses alleged and that, even if it was relevant, the prejudicial nature of the testimony outweighed any probative value. *See* Tex. R. Evid. 403.

During the guilt-innocence phase of trial, the State called Dr. Matthew Ferrera to testify about the effect of sexual sadism on child victims and their ability to report offenders. Ferrera did not have any personal knowledge of the facts of the case. He did, however, review the police report.

Ferrera is a licensed psychologist specializing in the study of sexual abuse in general and sexual sadists in particular. Ferrera has either assessed or treated at least thirty-three sexual sadists over the course of his career. During trial, Hatter did not dispute the qualifications of Ferrera or the reliability of his testimony. Hatter only objected to the relevance of his testimony about sadism.

To admit expert testimony, the trial court must find that the evidence satisfies both Rule 702, that the testimony will be helpful to the trier of fact, and Rule 403, that the testimony's probative value is not outweighed by any prejudicial effect. Tex. R. Evid. 403, 702; *Jordan v. State*, 928 S.W.2d 550, 554 (Tex. Crim. App. 1996); *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992). We review the trial court's decision to admit expert testimony for an abuse of discretion. *Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005). The appellate court must uphold the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Id*. The appellate court reviews the ruling of the trial court in light of what was before it at the time the ruling was made. *Id*.

Rule 702 states that if the expert's "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," then the expert "may testify thereto in the form of an opinion or otherwise." Tex. R. Evid. 702. An expert's testimony can be helpful to the trier of fact even when the expert does not have personal knowledge of the relevant facts. *Matson v. State*, 819 S.W.2d 839, 853 (Tex. Crim. App. 1991).

However, an expert witness's testimony must aid the jury and not supplant its determination. Tex. R. Evid. 704; *Schutz v. State*, 957 S.W.2d 52, 59 (Tex. Crim. App. 1997). Expert witness testimony concerning child sexual abuse does not aid the jury when it constitutes a direct opinion on the child victim's truthfulness and in essence, decides an ultimate fact issue for the jury. *Yount v. State*, 872 S.W.2d 706, 708 (Tex. Crim. App. 1993). Expert witness testimony should only be admitted when it is helpful to the jury and limited to situations in which the expert's knowledge and experience on a relevant issue are beyond that of an average juror. *Williams v. State*, 895 S.W.2d 363, 366 (Tex. Crim. App. 1994); *Yount*, 872 S.W.2d at 710-11 (citing *Duckett v. State*, 797 S.W.2d 906, 914 (Tex. Crim. App. 1990)).

Expert witness testimony that a child victim exhibits elements or characteristics that have been empirically shown to be common among sexually abused children is relevant and admissible under Rule 702 because it is specialized knowledge that is helpful to the jury. *Perez v. State*, 113 S.W.3d 819, 832 (Tex. App.—Austin 2003, pet. ref'd); *Hitt v. State*, 53 S.W.3d 697, 707 (Tex. App.—Austin 2001, pet. ref'd); *Gonzales v. State,* 4 S.W.3d 406, 417 (Tex. App.—Waco 1999, no pet.); *Vasquez v. State*, 975 S.W.2d 415, 417 (Tex. App.—Austin 1998, no pet.); *Decker v. State*, 894 S.W.2d 475, 479 (Tex. App.—Austin 1995, pet. ref'd). As long as the expert does not

give a direct opinion about the truthfulness of a particular complainant, such testimony is not impermissible "bolstering." *See Cohn v. State*, 849 S.W.2d 817, 819 (Tex. Crim. App. 1993); *Mumphrey v. State*, 155 S.W.3d 651, 656 (Tex. App.—Texarkana 2005, pet. ref'd).[1] Such testimony can assist the trier of fact in determining how child victims of abuse typically behave:

> The rationale is that while the common experience of jurors enables them to assess the credibility of alleged assault victims generally, the unique pressures surrounding a child victim, and their concomitant effects on the child's behavior, are such that an expert's testimony is deemed useful in assisting the jurors' assessment of the child's credibility. The expert's testimony about the general behavioral traits of child victims—e.g., delay in reporting the incident, recantation, truancy, embarrassment, running away from home, and inconsistent versions of abuse—explains to the jurors that such behavior, which might otherwise be attributed to inaccuracy or falsification, is typical of the class of victims and does not necessarily indicate a lack of credibility. Thus, such testimony, which allows the jury to assess the credibility of a particular complainant more fairly by explaining the emotional antecedents underlying the typical victim's behavior, meets the requirements of Rule 702.

---

[1] The *Cohn* court explained the difference between evidence that impermissibly "bolsters" a witness and evidence that merely corroborates:

> "Bolstering" may perhaps be understood a little more precisely to be any evidence the sole purpose of which is to convince the fact-finder that a particular witness or source of evidence is worthy of credit, without substantively contributing "to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *See* Rule 401, *supra*. Accordingly, evidence that corroborates another witness' story or enhances inferences to be drawn from another source of evidence, in the sense that it has an incrementally further tendency to establish a fact of consequence, should not be considered "bolstering."

*Cohn v. State*, 849 S.W.2d 817, 819-20 (Tex. Crim. App. 1993).

Ferrera did not offer his opinion about the credibility or truthfulness of the complainants; therefore, his testimony cannot be considered "bolstering."

*Kirkpatrick* v. State, 747 S.W.2d 833, 836 (Tex. App.—Dallas 1987, pet. ref'd).

In this case, the jury heard evidence that the teenagers were subjected to sadistic physical and sexual abuse. Ferrera testified to how sadistic abuse affects the ability of child victims to testify against their abusers:

Q: Now, with regard to victims that have gone through this sexual sadism experience, what about that effect, if any—what effect, if any, would that have on them being able to testify in front of the predator?

A: That would be very difficult to do. One of the effects of all sexual abuse, and in particular sexual sadism, is something called "powerlessness," where the individual truly feels that they have no power. To be in the presence of the perpetrator, especially if the perpetrator is a sadist, can make the person freeze up, can make the person non-responsive. In extreme cases, it can cause them to break down and try to escape. If—this chair, for example, if a victim was sitting in this chair, they might want to bolt, run, get out of this whole courtroom.

. . . .

Q: Now, would it surprise you or would you expect that children that were testifying in front of a sexual sadist, would they typically respond with they didn't remember rather than telling the events of what happened in front of that same predator?

A: I would assume that they would say "don't know," look the other way, try not to give a whole lot of information.

This testimony assisted the jury in understanding the behavior of child victims of sexual sadism, and we do not believe the district court abused its discretion in admitting it. The court could not expect the average juror to know how sadistic abuse affects children who are subject to it. Ferrera's testimony was particularly relevant in this case because all three teenagers occasionally would state that they "did not remember" or "did not know" what exactly went on

10

during the incident. For example, C testified that he did not remember how he was handcuffed, A testified that he did not remember whether or not Hatter was wearing clothing when he saw him having sex with B, and B testified that she did not remember whether Hatter took her clothes off or if she took her clothes off. B was so distraught during her testimony that at one point she completely broke down on the stand and was unable to resume her testimony until the following day. Although there may be many reasons why a child witness may exhibit such behavior on the stand, Ferrera's testimony gave the jurors one possible explanation for why child victims of sexual sadism would not remember certain facts or would have difficulty testifying in front of their abuser. Ferrera's testimony was, therefore, relevant under Rule 702.

In the alternative, Hatter argues that the testimony was more prejudicial than probative under Rule 403. Relevant evidence must be excluded when there is a clear disparity between the degree of prejudice of the offered evidence and its probative value. Tex. R. Evid. 403; *Jones v. State*, 944 S.W.2d 642, 653 (Tex. Crim. App. 1996).

To violate Rule 403, it is not enough that the evidence is "prejudicial"—it must be unfairly prejudicial. *Vasquez v. State*, 67 S.W.3d 229, 240 (Tex. Crim. App. 2002). Unfair prejudice occurs when the evidence has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id*. The trial court's ruling to admit evidence over a Rule 403 objection is measured by an abuse-of-discretion standard. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990). The ruling is not an abuse of discretion if it was within the "zone of reasonable disagreement." *Id*.

11

Hatter contends that the evidence was of little probative value because sadism was not an element of any of the offenses alleged by the State. However, because the alleged abuse was sadistic in nature, Ferrera's testimony shed light on such relevant issues as how the abuse may have injured and psychologically affected the victims, how the victims may have been threatened and placed in fear, and whether any behavior the victims engaged in with each other may have been coerced. Because of their young age and the traumatic nature of the abuse, the teenagers themselves were unable to explain fully what happened to them and how the incident affected them. We find nothing in Ferrera's testimony that was unfairly prejudicial, and we conclude that the district court did not abuse its discretion in admitting the evidence.

Furthermore, even assuming that the trial court abused its discretion in admitting Ferrera's testimony, Hatter is not entitled to reversal unless he shows that the error was: (1) of constitutional magnitude, or (2) affected a substantial right. Tex. R. App. P. 44.2(a), (b). The erroneous admission of expert testimony is non-constitutional error. *See Sexton v. State*, 93 S.W.3d 96, 101 (Tex. Crim. App. 2002). Accordingly, the error must be disregarded unless Hatter's substantial rights are affected. Tex. R. App. P. 44.2(b). Substantial rights are not affected by the erroneous admission of evidence if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). In assessing the likelihood that the jury's decision was adversely affected by the error, the appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the

12

character of the alleged error, and how it might be considered in connection with other evidence in the case. *Motilla*, 78 S.W.3d at 355. We may also consider the jury instructions, the State's theory and any defensive theories, closing arguments, and even voir dire, if applicable. *Id*. at 355-56. We may also consider whether the State emphasized the error. *Id*. at 356.

After reviewing the record, we believe any prejudicial effect the evidence may have had on the jury was minimized by the fact that, before Ferrera's testimony, the victims had already provided detailed testimony about the sadistic nature of the acts Hatter committed against them. Also, pictures of the clothespins, nipple clamps, and handcuffs that were used on the boys were admitted into evidence. Because there was ample evidence in the record regarding the sadistic nature of the abuse, we conclude that the admission of Ferrera's testimony did not affect Hatter's substantial rights. We overrule Hatter's first issue.

**Questions concerning the teenagers' history**

In his second and third issues, Hatter asserts that the trial court erred in not allowing him to ask A and C certain questions during cross-examination. During a bench conference, Hatter submitted to the district court the following questions addressed to both A and C:

Are you on probation for theft, shoplifting or skipping school?

Have you previously gotten into trouble for skipping school?

In addition, Hatter submitted the following question addressed only to C:

[Have] you previously had sex with B before August 21, 2003?

13

The district court did not allow Hatter to ask these questions. Hatter argues that these questions were admissible to attack the credibility of the male victims. The trial court has discretion to decide the admissibility of evidence and, absent an abuse of discretion, its rulings will not be overturned. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). Thus, an appellate court should affirm the trial court's evidentiary ruling if it was within the zone of reasonable disagreement. *Id*.

### *Prior crimes*

Texas Rule of Evidence 609 permits the credibility of a witness to be attacked with evidence of the witness's conviction for a felony or crime involving moral turpitude. Tex. R. Evid. 609(a). However, evidence of juvenile adjudications is ordinarily not admissible for impeachment purposes. *Id*. 609(d). The reason for this rule is that juvenile adjudications are not convictions. Tex. Fam. Code Ann. § 51.13(a) (West Supp. 2005). In limited circumstances, the constitutional right to cross-examination may require a juvenile adjudication to be admitted. *Foster v. State*, 25 S.W.3d 792, 795 (Tex. App.—Waco 2000, pet. ref'd). For example, a pending juvenile charge may be admissible on cross-examination to show the motive or bias of the witness to testify favorably for the State. *Carmona v. State*, 698 S.W.2d 100, 102 (Tex. Crim. App. 1985); *Harris v. State*, 642 S.W.2d 471, 476 (Tex. Crim. App. 1982). Also, a defendant is permitted to cross-examine a crucial witness regarding his juvenile record for the limited purpose of showing bias where the witness was on probation for the juvenile crime while assisting the police and testifying in court. *Davis v. Alaska*, 415 U.S. 308 (1974). Defendants are not, however, permitted to cross-examine a witness regarding

14

prior juvenile adjudications for general character impeachment purposes. *Foster*, 25 S.W.3d at 795; *Gilmore v. State*, 871 S.W.2d 848, 851 (Tex. App.—Houston [14th Dist.] 1994, no pet.).

Because A and C are juveniles, if they had committed theft, shoplifting, or truancy as Hatter alleged, these offenses would have resulted in juvenile adjudications inadmissible under Rule 609(d), not criminal convictions admissible under Rule 609(a), and Hatter has made no showing as to why the adjudications would be relevant apart from general character impeachment purposes. The district court did not abuse its discretion in refusing to allow Hatter to ask questions related to those offenses.[2]

### *Previous sexual conduct*

Specific instances of a victim's past sexual conduct are admissible only if three conditions are met: (1) the evidence falls within one of the limited exceptions in Rule 412(b)(2); (2) the defendant informs the court outside the jury's presence prior to introducing the evidence or asking any such question of his intent to do so; and (3) the trial court finds that the probative value of the evidence outweighs the danger of unfair prejudice. Tex. R. Evid. 412; *Marx v. State*, 953 S.W.2d 321, 337 (Tex. App.—Austin 1997), *aff'd*, 987 S.W.2d 577 (Tex. Crim. App. 1999).

---

[2] In addition, we note that, even if the offenses had resulted in criminal convictions, the party seeking to introduce evidence pursuant to Rule 609 has the burden of demonstrating that the probative value of a conviction outweighs its prejudicial effect. *Theus v. State*, 845 S.W.2d 874, 880 (Tex. Crim. App. 1992). Hatter made no such showing, either during trial or in his brief.

15

The limited exceptions in Rule 412(b)(2) apply when the evidence:

(1) is necessary to rebut or explain scientific or medical evidence offered by the State;

(2) is of past sexual behavior with the accused and is offered by the accused upon the issue of whether the alleged victim consented to the sexual behavior which is the basis of the offense charged;

(3) relates to the motive or alleged bias of the victim;

(4) is admissible under Rule 609; or

(5) is constitutionally required to be admitted.

Tex. R. Evid. 412(b)(2).

Evidence that C previously had sex with B does not fall under any of these exceptions. Hatter asserts, however, that evidence of a consensual sexual relationship between B and C could relate to the motive of C to lie "so that he wouldn't get into trouble" for having sex. However, the proposed question asked about *any* sexual activity between B and C occurring prior to the date of the incident. This question is not highly probative of whether C had a motive to lie about sexual activity between B and C during the incident. We also note that Hatter made no showing either during trial or in his brief that the probative value of a sexual relationship between B and C outweighed the danger of unfair prejudice.

The district court did not abuse its discretion in refusing to allow Hatter to ask A and C about their prior offenses and C about his prior sexual conduct with B. We overrule Hatter's second and third issues.

16

**CONCLUSION**

Having overruled Hatter's issues on appeal, we affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices B. A. Smith and Pemberton

Affirmed

Filed:   May 26, 2006

Do Not Publish