TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-07-00467-CV






Mark Rodriguez and Carmen Rodriguez, Appellants


v.


Texas Department of Family and Protective Services, Appellee






FROM THE DISTRICT COURT OF CALDWELL COUNTY, 421ST JUDICIAL DISTRICT

NO. 06-FL-018, HONORABLE TODD A. BLOMERTH, JUDGE PRESIDING




M E M O R A N D U M O P I N I O N



 Mark Rodriguez and Carmen Rodriguez appeal from the final order in this
suit affecting the parent-child relationship with their daughter, B. R. (1) The order appointed the
Department of Family and Protective Services (FPS) as the permanent managing conservator and
appointed both appellants as possessory conservators with limited visitation rights. Appellants
complain that the trial court relied on hearsay, as well as fraudulent and unsubstantiated evidence. 
They also assert that the court made erroneous decisions and incorrectly required Mark Rodriguez
to undergo sex offender therapy. We affirm.

 The record on appeal consists only of the clerk's record. Appellants did not request
the preparation of a reporter's record. They assert that no reporter was present during the final set
of hearings, but that the judge presiding recorded proceedings on her laptop computer. Appellants
assert that the clerk's record provides adequate evidence to support their complaints, rejecting FPS's
argument that the absence of a reporter's record prevents this Court from reversing the order because
we cannot review the evidence admitted at the trial.

 Appellants also filed a Motion for Appellate Court to Provide Alternatives to Court
Reporter's Record if Court Reporter Record is Required by Appellate Court, which this Court
denied. In that motion, they asserted that, although they did not request a reporter, the absence of
a reporter was a denial of their right to a fair hearing. They asserted that the clerk's office failed to
include exhibits as requested. (2) The motion states that, despite the absence of these exhibits:


 Appellants believe there is adequate evidence for the Appeals Court review of the
case development, proceedings and conclusions. The undersigned requests that
should the Appeals Court mandate a transcript of the final hearing, then the
Appellants request either:


  The Appeals Court to utilize the digital recording available from the Caldwell
County court or


  Allow the Appellants' discretion on a partial transcription of the final hearing
day of the six day trial.


Appellants asserted in the motion that preparation of the full reporter's record would be several
thousand dollars and beyond their financial resources.

 We overruled appellants' motion because their motion essentially asked this Court
to decide for appellants how to pursue this appeal. This Court is a neutral arbiter and cannot direct
a party's strategic decisions. (3) Under the rules, appellants have the burden of making many decisions,
including what issues to present, what relief to request, what portions of the trial court record to
request be included in the record on appeal, and how to craft a brief that best serves their interest. 
See Tex. R. App. P. 34.6(b), 38.1. The appellate court does not "mandate" a reporter's record absent
the party's request and the reporter's failure to provide it. Appellants chose not to request
the reporter's record, stating that they "believe there is adequate evidence for the Appeals Court
review of the case development, proceedings and conclusions." Appellants have chosen to rely
on materials in the clerk's record to support their issues presented, as is their prerogative. See
Tex. R. App. P. 37.3(c).

 In the absence of a reporter's record from a bench trial, a court must presume
that the omitted proceedings are relevant to and support the trial court's judgment. Hebisen
v. Clear Creek Indep. Sch. Dist., 217 S.W.3d 527, 538 (Tex. App.--Houston [14th Dist.] 2006,
no pet.). Therefore, this Court must presume that (1) the trial court properly exercised its discretion
to hear evidence regarding all of the issues, whether appealed or not, and (2) the trial court heard
evidence that is legally sufficient to support its judgment. Id. This standard arguably would require
that we affirm the final order without further deliberation. However, because of the importance of
the rights at stake in this child custody case and because the clerk's record includes statements and
affidavits, we will examine the issues presented in light of the documents in the clerk's record.

 The clerk's record contains statements made to law enforcement by Carmen
Rodriguez, appellants' children, and a neighbor about specific incidents and general conditions
in the Rodriguez home. The taking of statements was apparently prompted by a report to a
neighbor by appellants' 19-year-old daughter, J. R., of severe neglect, sexual and physical abuse,
and long-term physical and emotional isolation. Authorities were contacted, and the family gave
written statements.

 In a statement dated January 8, 2006, Carmen recounted an incident in July 2003 in
which "Mark was trying to hurt [her older daughters] and [an older son] was protecting [them]. . . . 
Mark is a violent person and frequently emotionally abusive. I did not know he was molesting my
daughter [J. R.] until today."

 According to their 25-year-old daughter, Monique, Mark "forces himself" on female
family members, which she describes by saying "his presence makes [the girls in the family] and
my mom uncomfortable and he will not leave them alone." The altercation Carmen recounted
was, according to Monique's statement, prompted by Mark's increasingly heated inquiries
into credit card balances. She also reported that "yesterday, January 7, 2005, I found out that
[sisters J. R., C. R., and B. R.] were asked by Mark to take off their clothes so he can take pictures
of them naked." (4)

 Appellants' 28-year-old son, Lorran, corroborated the story about the credit card
altercation. He added the detail that, before the altercation, Mark was angry because a friend of
Carmen's--who Mark believed was advising her to divorce Mark--had called the house. Lorran
also recounted an incident in which Mark asked Lorran and a sibling to get a gun and shoot him. 
Lorran said that J. R. told him that Mark tried to get the sisters to take nude photographs. Lorran
said that his grandmother feared that Mark was going to hurt the remaining children if they
stayed with him.

 Appellants' 24-year-old daughter, Chantre, gave her account of the credit card
altercation. She did not remember the details of the conversation, but she did recall Mark's anger
and the tension as their brother attempted to block Mark's path to the daughters' room. She recalled
getting between the men and preventing a physical struggle.

 Appellants' 21-year-old son, Einnar, stated that Mark showed the three youngest
sisters a pornographic magazine in 2000. He also wrote that Mark "reportedly molested them
according to my 3 youngest sisters." Einnar stated that Mark tried to get the girls to join a strip club
so that Mark could quit his job.

 J. R. wrote that Mark physically abused her and her mother and "had been into child
pornograp[hy] and molesting children as far back as I remember." She also stated that she and her
siblings were victims. She wrote that she had been "forced to do sexual acts with" Mark "since I
was 8-16 years old." She stated that he threatened her when she questioned their activities and
became violent when she asked him to stop. She also recounted an incident in 2000 during which
Mark drove her and her sisters to an isolated area, tied them down, and molested them individually. 
She wrote about more sexual assaults on her that occurred in 2001. She said that she eventually
demanded that he stop, which he did, but that she stayed in the home to protect her sisters. 
Nevertheless, J. R. stated that Mark "started taking my two younger sisters alone in the van [he]
currently has, I suspected he was abusing or molesting them because they would come back fearful
& upset, soon later had suicidal thoughts & talk." Her account of the July 2003 incident included
her memory that Mark threatened them with a shotgun. She stated, "This man has certainly the
stalke[r] personality, that's why all fear him or reporting for help, it needs t[o] stop for my family's
sake as well [as] others who are in danger, possibly other children."

 Appellants' then-16-year-old daughter, C. R., confirmed that, six years earlier, Mark
asked her and her sisters to pose nude for photographs so they could be rich. She testified that, in
2001, she and her siblings opened Mark's bag and found a magazine with pornographic images of
12-year-old girls. Mark was angry when he found the children and yelled at them. He yelled at J. R.
and asked her "What did you see?" When she did not answer, he shook her and threw her down. 
She also recalled the July 2003 altercation, but did not recount a discussion preceding it. She did
write that Mark yelled and was choking Lorran, then that Lorran began choking Mark. C. R. also
recounted seeing Mark try to touch J. R.'s breast once while he was driving and J. R. was seated next
to him in the front seat, and another time while they were watching a movie at home. C. R. stated
that she did not see such behavior at other times but that J. R. "has told me it has happened more."

 These allegations prompted authorities to arrest Mark for sexual assault and to ask
further questions. Carmen stated that she did not believe J. R.'s accusations of sexual assault. Based
on the initial allegations and Carmen's refusal to believe them, FPS removed the then-minor
children--16-year-old C. R. and 13-year-old B. R.--from the parents' home.

 Family members, including Mark and J. R., filed affidavits in February 2006 that
explain, modify, or retract the statements they gave in January 2006.

 Mark denied or explained why the allegations in the family's January statements did
not support removal of the remaining minor children. He asserted that he did not fit the profile of
a sexual abuser and that J. R. did not exhibit behaviors of a victim. He said that she demanded a lot
of attention and persuaded the other girls to lie about him on January 7, 2006. He asserted that
J. R.'s statement tracked the family code statutes as if a checklist had been used when neighbors
assisted her in preparing her statement. Mark said that the July 2003 altercation was the result of
financial and marital stress, that no gun was involved, that no choking or fistfight occurred, and that
it was simply a wrestling match that was over in a few minutes. He said that the magazine that C. R.
reported finding in his bag was not child pornography because that is illegal and not obtainable at
the New Braunfels convenience store where the magazine was purchased, and that the photo was of
a subject with a child-like face. Mark contended that the allegations were not supported by a
preponderance of evidence and did not support removal of the children.

 In Carmen's affidavit, she averred that she never saw J. R. show behaviors typical of
abuse victims. Carmen is a registered nurse. She asserted that J. R. is outgoing and has a good
relationship with Mark. Carmen stated that she did not know what to say in her written statement,
but that the detective who questioned her and her family for five hours insisted that they put
something down. She said that her statement that "'[h]e is a violent person' refers to the incident
when he damaged a dog kennel during a temper flare up when my daughter [J. R.] disrespectfully
said Mark 'ate like a pig' on his birthday in April 2002." Otherwise, she had not seen him be
violent. Her statement that Mark was "frequently emotionally abusive" referred only to his
insistence on remaining married despite her "constantly asking for us to separate." Since their debts
had been discharged in bankruptcy in January 2006, she said the stress had eased and she believed
their marriage could work.

 Lorran filed an affidavit in which he denied that Mark ever pointed a gun at anyone. 
He said he had never seen pornography in their house, their vehicle, or computers, nor had he seen
Mark naked. He said he generally tends to disregard his grandmother's statements as outlandish. 
He corroborated Mark's version of the July 2003 altercation as being overreactions by him and his
father, and said that no weapons, choking, punching, fist fighting or kicking was involved. Lorran
said that, since J. R. told him about Mark's request that the girls be photographed nude, he had
watched their interactions. He said he had noticed no unusual or inappropriate affection or
conversation between Mark and J. R. Lorran said that J. R. demands attention and is prone to lying. 
He recounted several of J. R.'s outbursts, including one in which her father was repairing a shower,
and J. R. began throwing his tools and screaming "get out," claiming that Mark had beat her cat
with tools; Lorran found the cat uninjured. Lorran said that once, when J. R.'s bike got a flat
tire, she refused his offer of a ride home, claiming that he had "summoned devils out to cause
her tire to go flat."

 Monique also elaborated on her statement. She said she mentioned the July 2003
altercation because the detective "insisted we put something down on paper or it would look
suspicious." When she said her mother received most of the emotional abuse, she meant that Mark
is very persistent about wanting to talk problems out, in contrast to Carmen, who does not like to talk
when she is upset. Monique wrote that massive credit card debt was a source of tension. She wrote
that her statement that Mark "forces himself on the girls" referred to his persistence in maintaining
communication and his desire to spend time with them on his days off. She said she had never seen
him with pornography and had never heard the accusations about his desire to take nude photographs
of the younger girls before January 2006.

 Chantre also averred that she wrote something down in her statement just to appease
the detective. She added that Mark never threatened them with a gun. She denied ever seeing her
sisters with unexplained injuries. She said that J. R. was always very vocal and would have
complained had something been wrong. Chantre wrote that J. R. was very emotional and susceptible
to uncontrolled emotional outbursts over trivial events. Chantre wrote that she had never seen or
heard any sexual abuse and had not seen her father naked.

 J. R. later filed an affidavit in which she recanted all of her accusations. She
described in great detail how she used the opportunity provided by her neighbor's belief that abuse
was occurring in the house as a way to get Mark to stop looking at pornography. She said that her
neighbor was obsessed with her family and believed that God had sent her to protect the Rodriguez
children--to the extent that she had moved from another town at the insistence of audible
disembodied voices. J. R. stated that she embellished the facts by alleging that her father's
pornography was of children, by inventing the allegation that he wanted to take nude photographs
of her and her sisters, and by inventing the allegation that he sexually abused her. She averred that
she made up these allegations hoping to shock her father into renouncing pornography. She stated
that she had been manipulated by others and that, when she realized the true effect of her false
allegations, she regretted and recanted them. She stated that her neighbor threatened that God would
reject J. R. if she recanted her testimony.

 Carmen later filed a complaint with the Texas Department of State Health Services
regarding actions by licensed substance abuse counselor Carrie Roper. Carmen asserted that Roper
conspired with her neighbor to persuade J. R. that she had repressed memories of sexual abuse. 
Carmen also asserted that Roper's giving J. R. a book on the theory of repressed memories as well
as associated counseling, violated state licensure laws barring counseling personal friends.

 Carmen filed a complaint with the Texas State Board of Medical Examiners that her
father-in-law, Dr. J. A. Rodriguez, violated his professional responsibilities and duties prompted by
his interaction with J. R. According to the complaint, Dr. Rodriguez is an 81-year-old retired
physician who received e-mails from J. R. in which she claimed Mark had physically and sexually
abused her. Carmen complained that, instead of reporting the allegations of abuse to authorities or
to the family, Dr. Rodriguez corresponded with J. R., "diagnosing Mark (via what [J. R.] said in her
e-mails) as being 'mentally ill', 'he will kill someone if he gets into a rage' and 'I am afraid for the
safety of the family.'" Carmen then reported that Dr. Rodriguez disagreed with their choice to
home-school their children and had not maintained regular communication with the family during
her marriage to Mark. She asserted that Dr. Rodriguez changed his views of J. R. when he learned
that J. R was making some sort of allegations against him, deeming J. R. "'bipolar', 'paranoid
schizophrenic', and 'crazy' and 'if you let her back in your house watch your back because she will
put a knife in your chest.'" Carmen complained that Dr. Rodriguez engaged in unprofessional
conduct in his e-mail communications with J. R. and violated his duty to report J. R.'s allegations
if he believed them.

 A service plan was adopted that allowed the girls to live at home with their mother,
provided they had no contact with the males in the family. The plan required that the parents attend
various types of classes and counseling, which they did. After finding that appellants had violated
the court's requirement that they not discuss the case with their children, the court removed the
children from their mother's home and directed FPS to place them. The males in the family were
then permitted to return to the family's home. A subsequent order prohibited Mark from having
contact with the two girls. (5) Before the final hearing, C. R. turned eighteen and was no longer a
subject of this proceeding. Each appellant had legal counsel who were later allowed to withdraw
because appellants no longer wished to retain them.

 The final order under appeal here establishes FPS as the permanent managing
conservator for B. R., naming appellants possessory conservators. The order permits Carmen to have
weekly supervised visits with B. R. as well as unsupervised visits "upon the recommendation of a
therapist. Mrs. Rodriguez may choose the therapist." The order permits Mark to have supervised
visits with B. R. "until the criminal case is resolved. Once his criminal case is resolved he may
continue to have supervised visits only if he attends sex offender therapy." According to appellants,
the criminal charges against Mark were dismissed two days after the final hearing in this case.

 Appellants present several issues. They contend that the trial court erred by
(1) relying heavily on hearsay, conjecture, and unsupported evidence, (2) using only fraudulent,
selective evidence, (3) validating FPS's actions in removing the children without a court order or
following proper procedures, (4) determining that Carmen failed to supervise and was not protective
without establishing that abuse occurred, (5) requiring Mark to undergo sex offender therapy, and
(6) relying heavily on the report by FPS's expert, Matthew Ferrara, which they allege was based
solely on conclusions relying on the veracity of J. R.'s original accusations.

 In their first issue, appellants complain that "hearsay was the major part of the
evidence presented in the form of emails, perjured testimony, suppressed documents and
unsupported accusations against the appellants." We do not know what documents were admitted
as evidence during the trial. Nevertheless, we find no error if the evidence complained of was
the documents in the clerk's record. The rules of evidence provide that error cannot be shown in a
ruling admitting or excluding evidence unless "a timely objection or motion to strike appears of
record, stating the specific ground of objection, if the specific ground was not apparent from the
context" or, "[i]n case the ruling is one excluding evidence, the substance of the evidence was made
known to the court by offer, or was apparent from the context within which questions were asked." 
See Tex. R. Evid. 103(a). The rules of appellate procedure similarly require the following:


 As a prerequisite to presenting a complaint for appellate review, the record must
show that:


 (1) the complaint was made to the trial court by a timely request, objection, or
motion that:


 (A) stated the grounds for the ruling that the complaining party sought from
the trial court with sufficient specificity to make the trial court aware of the
complaint, unless the specific grounds were apparent from the context; and


 (B) complied with the requirements of the Texas Rules of Civil or Criminal
Evidence or the Texas Rules of Civil or Appellate Procedure; and


 (2) the trial court:


 (A) ruled on the request, objection, or motion, either expressly or implicitly;
or


 (B) refused to rule on the request, objection, or motion, and the complaining
party objected to the refusal.


Tex. R. App. P. 33.1(a). The record before us does not contain any objections to the evidence. We
find no indication that evidence was suppressed, or that suppressed evidence was considered. 
Whether evidence is credible or supported generally affects the weight accorded the evidence. For
the court to be required to entirely disregard evidence, an objection or other means of exclusion had
to be made. No error is shown by the court's consideration of unobjected-to evidence.

 In their second issue, appellants contend that "fraudulent evidence was used to
fundamentally deny fair procedures before child removal, a right included in procedural due
process." The substance of the argument in their brief pertains to FPS's use of evidence derived
from J. R.'s original accusations that Mark sexually assaulted her, even though she later recanted
those accusations. Appellants contend that suppression by the prosecution of material evidence that
is favorable to an accused violates due process, as does a prosecutor's knowing presentation of false
testimony or failure to correct testimony he knows is false. This is not a prosecution, however, and
more to the point, the record before us does not demonstrate that J. R.'s statements recanting her
January statements were suppressed, that FPS's attorney knew that J. R.'s original accusation was
false, or that the original accusation is necessarily false. At least one of J. R.'s contrary statements,
her affidavit dated June 8, 2006, is in the clerk's record. More may have been admitted at trial, but
we do not have that record before us. Recantation of an earlier statement--however forceful or
repeated--does not necessarily make the earlier statement false. The recantation itself may be false. (6)
The resolution of the contradiction is a credibility issue for the factfinder. The Department did not
commit fraud or violate anyone's rights merely by offering a recanted statement and, on this record, 
the court did not err by admitting or considering it.

 In their third issue, appellants contend that "the Fourth Amendment was violated
(among many others) since there was no probable cause established for child removal." Appellants
complain that FPS did not conduct a sufficiently thorough investigation before removing C. R. and
B. R. from their home. (7) Appellants assert that FPS lacked probable cause to seize the children on
January 11, 2006, and that there was no evidence the children were in imminent danger. It is not
entirely clear how the evidentiary basis for the initial removal relates to any alleged error in the final
order rendered after a full hearing. Nevertheless, we will examine whether FPS had any sound basis
for removing the children on January 11, 2006.

 A qualified person can remove children without a court order under limited
circumstances, including based "on information furnished by another that has been corroborated by
personal knowledge of facts and all of which taken together would lead a person of ordinary
prudence and caution to believe that" either "there is an immediate danger to the physical health or
safety of the child" or "that the child has been the victim of sexual abuse." Tex. Fam. Code Ann.
§ 262.104(a) (West Supp. 2007). In statements to a Caldwell County Sheriff's Office investigator
dated January 8, 2006, the family members recounted or reported hearing of incidents of Mark
making threats, physically assaulting one child, encouraging then-minor girls to pose nude for
pictures, and sexually abusing at least one girl. In her affidavit in support of FPS's original petition,
filed January 13, 2006, FPS specialist Marijo Shearin recounted the statements the family had given,
supplemented by additional reports of abuse and statements taken from the younger daughters in
interviews at the children's advocacy center. Shearin also reported that, on January 11, 2006,
Carmen reported that she had posted bond for Mark after his arrest for sexual assault and stated that
she did not believe J. R.'s accusations of sexual abuse. Shearin concluded that there was an
immediate danger to the children in the home because of the reported abuse by Mark and his
probable imminent return to the home. The information Shearin described in her affidavit does not
appear materially different from the information she had on January 11, 2006, when she made the
decision to remove the children from the home. We conclude that appellants have not shown error
in the initial removal requiring reversal of the trial court's final order.

 In their fourth issue, appellants contend that, "without established abuse, there can
be no failure to supervise and protect." This appears to be a challenge to the sufficiency of the
evidence to support the trial court's decision not to name Carmen as a managing conservator and
specifically references the failure to establish sexual abuse by Mark. They also argue that Caldwell
County unlawfully suppressed J. R.'s affidavit of nonprosecution and petition to rescind a
fraudulently obtained protective order.

 The primary consideration in conservatorship cases is the best interest of the child.
Tex. Fam. Code Ann. § 153.002 (West 2002). A parent (or both parents) will be appointed sole
(or joint) managing conservator "unless the court finds that the appointment of the parent or parents
would not be in the best interest of the child because the appointment would significantly impair the
child's physical health or emotional development." Id. § 153.131(a). FPS's burden of proof
is preponderance of the evidence. Id. § 105.005; see also In re W.M., 172 S.W.3d 718, 724
(Tex. App.--Fort Worth 2005, no pet.). The standard of review for determinations of a child's best
interest and conservatorship is abuse of discretion. Id. An abuse of discretion occurs only when the
court acts arbitrarily, unreasonably, or without regard to guiding rules and principles. Worford
v. Stamper, 801 S.W.2d 108, 109 (Tex. 1990).

 The record before us does not demonstrate that the trial court abused its discretion
by refusing to make Carmen a managing conservator. The trial court was required to assess the best
interest of the child, not merely whether Mark sexually abused one of the daughters and Carmen
ignored it. We do not know what evidence was admitted at trial. The clerk's record contains the
original statements from the family and others discussing various incidents of emotional, physical,
and sexual abuse. It also contains reports that Carmen rejected J. R.'s accusations. The record also
contains affidavits from family members explaining, contradicting, or withdrawing their original
statements. Where conflicting evidence is in the record, the trial court as factfinder must resolve the
conflict. Great Am. Ins. Co. v. Murray, 437 S.W.2d 264, 266 (Tex. 1969); Intec Sys., Inc. v. Lowrey,
230 S.W.3d 913, 920 (Tex. App.--Dallas 2007, no pet.). We must defer to the factfinder's
credibility determinations, particularly when custody is at issue. See Sotelo v. Gonzales, 170 S.W.3d
783, 789 (Tex. App.--El Paso 2005, no pet.); see also City of Keller v. Wilson, 168 S.W.3d 802,
819 (Tex. 2005). On the record presented to us, we cannot say that the trial court abused its
discretion when determining from the evidence before it that the best interest of the child was better
served by not having her parents as managing conservators.

 In their sixth issue, appellants contend that "Dr. Matthew Ferrara's findings,
conclusions and recommendations are not valid since they were based on outcry victim's false
allegations of sexual abuse which are unsupported by medical evidence." This issue apparently
relates to the sufficiency of the evidence underlying the trial court's order because the trial court
ordered that B. R. "NOT be placed with her parents unless recommended by Dr. Matthew Ferrara." 
Appellants do not cite this Court to a report by Dr. Ferrara in the record. Appellants assert that, in
late 2006, Dr. Ferrara strongly recommended sex offender treatment for Mark as an assurance that
he is safe with children. Appellants assert that this report did not refer to the later affidavits or
motions by J. R. and others contradicting the initial claims of sexual and other abuse. Appellants
also assert that Dr. Ferrara strongly encouraged Mark to take a polygraph examination, after which
the administrator opined that Mark's performance indicated deception--though about what precisely
the record is not clear. In addition to attacking the reliability of polygraphs, appellants contend that
Mark suffered an anxiety or panic attack from the administration of the test. He also contends that
FPS workers used psycho-sexual evaluation tools on him that are not appropriate for persons who
have not admitted guilt. We cannot evaluate the validity of Dr. Ferrara's findings on the record
before us. As we have concluded above, without reference to Dr. Ferrara's findings, the record
before us does not show an abuse of discretion in the court's conservatorship decision. Even if
Dr. Ferrara's findings are flawed, reliance on them would not necessarily show reversible error.

 In their fifth issue, appellants assert that, "since the father did not abuse the child as
established by lack of objective findings, requiring the father to make an admission by court ordered
sex offender therapy would be asking the father to lie and commit perjury." Appellants argue that
Mark is being placed in the untenable position of remaining silent in court-ordered therapy, resulting
in the loss of his child, or falsely confessing to abuse, resulting in a loss of liberty. He equates this
to court-ordered confession. We do not agree that attending therapy is equivalent to an admission
that he has committed abuse. Mark is not being prosecuted for sexual assault and the
conservatorship decision has been made without any express finding regarding sexual abuse. There
is no showing that the court-ordered therapy requires that Mark confess to sexual abuse. The
therapist may instead conclude that Mark did not commit any sexual abuse and, with Mark's
permission, inform the trial court of that conclusion. In any event, Mark could not commit perjury
in his therapy sessions because he would not be under oath or an inmate making an unsworn
declaration. See Tex. Penal Code Ann. § 37.02 (West 2003) (defining perjury). Appellants' fifth
issue does not present reversible error.



 We affirm the trial court's order.



 

 G. Alan Waldrop, Justice

Before Chief Justice Law, Justices Pemberton and Waldrop

Affirmed

Filed: May 8, 2008
1. Appellants proceeded pro se in the trial court and appear pro se on appeal.
2. Exhibits offered or admitted at trial properly accompany the reporter's record and must be
requested from the reporter. See Tex. R. App. P. 34.6(b)(1).
3. Appellants' pro se status does not affect this Court's role. "Litigants who represent
themselves must comply with the applicable procedural rules, or else they would be given an unfair
advantage over litigants represented by counsel." Mansfield State Bank v. Cohn, 573 S.W.2d 181,
185 (Tex. 1978).
4. The 2005 date noted in the statement appears to be an error. The statement was dated
January 8, 2006.
5. Appellants asserted in their status report that this change was the result of Mark taking a
polygraph examination at which the examiner determined there was deception indicated. Appellants
contended that the result was due to Mark's anxiety when placed in unfamiliar processes or
situations akin to being in a dentist's chair, which he finds difficult.
6. While the premise that a recantation, rather than the original statement, may be false is
self-evident, it has been noted that child victims of familial sexual assault may feel unique
pressure to make a false recantation. See Gonzales v. State, 4 S.W.3d 406, 418 (Tex. App.--Waco
1999, no pet.).
7. Appellants also assert that the removal deprived the children of due process under the Fifth
and Fourteenth Amendments. The children are not named parties to this appeal and their rights
cannot be asserted by the parents as individuals, which is the only way that appellants have appealed.