# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00599-CR

**Phill Raije Rian, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 26TH JUDICIAL DISTRICT
### NO. 06-1562-K26, HONORABLE BILLY RAY STUBBLEFIELD, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Phill Raije Rian guilty of three counts of sexual assault of a child for which it assessed prison terms of ten, thirteen, and ten years, respectively, with a recommendation of probation on the third count only. *See* Tex. Penal Code Ann. § 22.011 (West Supp. 2008). Appellant contends that the trial court abused its discretion by ordering the sentences to run consecutively and by refusing to hold a hearing on her motion for new trial. She further contends that the trial court erred by overruling the motion to suppress her recorded oral statements to the police. Finally, appellant contends that her trial counsel rendered ineffective assistance. We overrule these contentions and affirm the convictions.

**BACKGROUND**

Appellant, who was forty-one, and her two children, ages four and two, lived across the street from the complainant, K.B.C., and his family. K.B.C., who was sixteen, babysat and did errands for appellant, and the two became friends. During the summer of 2006, this friendship became a romance. The evidence shows that, on three different occasions, appellant engaged in oral sex with K.B.C. by putting his penis in her mouth. *See id.* § 22.011(a)(2)(C).

K.B.C.'s mother suspected that her son was having a sexual relationship with appellant, and she reported her suspicions to the Williamson County Sheriff's office. Detectives John Foster and Dennis Garrett spoke to K.B.C. on September 11, 2006. After first denying that he and appellant had been sexually intimate, K.B.C. told the detectives about the oral sex acts and also disclosed an act of sexual intercourse with appellant that took place at a hotel in Travis County.

The following day, Foster arranged for K.B.C. to make a recorded telephone call to appellant. During this call, K.B.C. attempted without success to have appellant acknowledge their sexual activities. Subsequently, K.B.C. had a face-to-face conversation with appellant that was also recorded by Foster. During this conversation, appellant told K.B.C. that "you can kill us" and "I'll do 25 years."

On September 14, Foster and Garrett went to appellant's house in the early afternoon. They told appellant what K.B.C. had said and asked her if she would be willing to discuss the matter at the sheriff's office. Appellant agreed to do so. Before leaving the house, the officers discovered that they had a flat tire on their car, and they left appellant alone for fifteen minutes while they put on the spare. Appellant, with her two children, then followed the detectives to the sheriff's office

2

in her own vehicle. Victim's services personnel watched the children while appellant was questioned in an interview room.

Foster began the interview by telling appellant that the door was unlocked and that she was free to leave at any time.[1] Appellant was given a cup of water, and she was provided water throughout the questioning. During the first hour of the interview, appellant insisted that she had had no sexual contact with K.B.C., and that the accusations against her were attributable to his mother's dislike of her. To this end, appellant described at length her various encounters with K.B.C.'s mother. After about an hour, Foster and Garrett began to press appellant to tell them the truth. Foster told appellant, "I don't want you leaving here without you understanding what's going on, okay? And I don't want you to leave here without me understanding what's going on. I need your side. I cannot help you, this man [Garrett] cannot help you unless I have the truth. And you have not been truthful."

At this point, appellant withdrew from her purse two business cards from an attorney, handed them to the officers, and said, "He said if you have any problem with [K.B.C.'s mother], have them talk to me. And he said don't say anything until they talk to me, but when you came to the door, I wanted to come with you." At this point, the officers reminded appellant that she was free to leave whenever she wanted, and the questioning continued. A few minutes later, after appellant again insisted that she had done nothing wrong, Garrett asked, "Then why would you get an attorney?" Appellant replied, "To protect my babies," adding that she had consulted the attorney for

_____

[1] The entire interview was video-recorded. Our summary of the interview is based on the trial court's written findings and our own viewing of the video.

the purpose of getting a restraining order against K.B.C.'s mother. Garrett asked appellant why the attorney had told her not to talk to the police, and she responded, "He didn't. He said if you have any problem with [K.B.C.'s mother]."

Appellant then asked to use the restroom. Foster replied, "You can go whenever you want," but asked appellant if she could wait, saying, "We're on a roll right now and we're getting some honest answers from you." The interview continued for another five minutes, when appellant again asked to use the restroom. The officers agreed, and everyone left the interview room. At this point, the interview had been going on for an hour and ten minutes. About two minutes later, the officers can be heard outside the interview room, looking for appellant. Foster says, "She's gone." Garrett replies that appellant's purse is still in the interview room and suggests that she might be checking on her children. Eventually, the detectives realize that appellant accidentally went to the men's restroom.

After appellant and the two detectives returned to the interview room, Foster asked her, "Did you check into a hotel room with [K.B.C.]?" Appellant paused and said, "You know what, that's going to sound too bad. I think in that case maybe you should call that attorney cause that's gonna sound—." Foster said, "Well, I'm not going to call an attorney. I think it's time for you to start being honest." Appellant replied, "Well, they said if I had any problem with [K.B.C.'s mother] for you to call them." Foster responded, "I'm not having a problem with [K.B.C.'s mother], I'm having a problem with you." Appellant said, "Well then, I need to call the attorney. I'm not trying to be rude." Foster said, "No," and began to play one of the recorded conversations from the previous day.

4

The two officers continued to urge appellant to tell them the truth regarding her relationship with K.B.C., and appellant repeatedly answered that she was afraid to do so. Foster asked appellant, "Did [K.B.C.] ask you to perform oral sex on him?" Appellant answered, "I'm afraid. I can't answer that. I'm afraid." Appellant expressed the fear that she would lose her children, saying "I don't want to trade [K.B.C.] for my kids." Foster told her, "You're not going to be doing that." Appellant replied, "Yeah, but I hear, like everybody's been telling me horror stories, that it doesn't matter that we're in love and that they're going to totally just put me in prison." When appellant continued to express her concerns about her children, Garrett promised her that she would be going home with her children, "100 percent guaranteed." Later, Garrett told appellant, "You're walking away from this room today with your children, trust me." Foster gave appellant a similar assurance: "[Y]ou're getting in that car and you're taking your kids home." At another point in the interview, Garrett asked appellant, "Why do you think your kids will be taken away for the rest of your life?" Appellant answered, "I don't know Texas law." Garrett responded, "Well, we do."

Foster told appellant that he could not help her if she did not tell him the truth. Appellant responded, "How are you gonna help me? I'm screwed." Appellant told the detectives, "[I]t's killing me because I'm not gonna leave here until I tell you the truth." Eventually, after about an hour and forty minutes of questioning, appellant told Foster and Garrett that she had "kissed [K.B.C.] there." She also acknowledged having sexual intercourse with K.B.C. at the hotel.

The questioning by the detectives lasted a total of two hours, but appellant remained in the interview room for another ninety minutes after the officers left. During a portion of this time, appellant was alone while she prepared a written statement and made a cell phone call to a friend.

5

Appellant was also interviewed by a child protective services worker. After the questioning ended, Foster went to a magistrate, who issued a warrant for appellant's arrest. Foster executed the warrant in the interview room, three-and-a-half hours after the questioning began. A video recording of the entire three-and-a-half hours was introduced for record purposes, but only an edited version of the two-hour interview, ending with appellant's admissions, was shown to the jury.

## ADMISSION OF STATEMENT

In three points of error, appellant contends that the trial court erred by overruling her motion to suppress her recorded oral statements to the detectives. A trial court's ruling on a motion to suppress is reviewed for an abuse of discretion. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). This means that the ruling will be upheld if it is reasonably supported by the record and is correct under any applicable legal theory. *Id*. The trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give almost complete deference to the trial court's determination of the historical facts, but we review de novo the trial court's application of the law to those facts. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000).

Appellant urges that her oral statements were inadmissible for three reasons: because she was denied her right to counsel under the Texas Constitution, because she was denied her right to counsel under the Fifth Amendment, and because the statements were involuntary. We will address each contention in turn.

6

***Article I, Section 10***

Article I, section 10 of the Texas Constitution guarantees the right to counsel in criminal prosecutions. This right does not attach, however, until formal charges are brought. *McCambridge v. State*, 778 S.W.2d 70, 76 (Tex. Crim. App. 1989). Appellant acknowledges in her brief that she was not formally charged until after the questioning had ended and the statements at issue had been made. For this reason, appellant's contention that she was denied her state constitutional right to counsel must necessarily fail.

***Fifth Amendment***

The Fifth Amendment guarantee against self-incrimination contains an implicit right to counsel during custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 469-70 (1966). When a suspect in custody asserts the right to counsel, all interrogation must cease until counsel is provided or until the suspect personally reinitiates the conversation. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). Appellant contends that she was in custody when she made her incriminating oral statements, and that she made two requests for counsel that were disregarded by the officers. The trial court concluded that appellant was not in custody at any time during her questioning by the detectives and was free to leave up until the moment she was arrested on the warrant. The conclusion that appellant was not in custody is subject to de novo review by this Court. *Herrera v. State*, 241 S.W.3d 520, 527 (Tex. Crim. App. 2007).

A person is in custody if, under the circumstances, a reasonable person would believe that her freedom of movement was restrained to the degree associated with a formal arrest. *Stansbury v. California*, 511 U.S. 318, 322 (1994); *Herrera*, 241 S.W.3d at 525; *Dowthitt v. State*,

7

931 S.W.2d 244, 254 (Tex. Crim. App. 1996). The initial determination of custody depends on the objective circumstances of the interrogation, not the subjective views of the police or the person being questioned. *Stansbury*, 511 U.S. at 323; *Dowthitt*, 931 S.W.2d at 254. The subjective views of the police officers regarding custody may become relevant if those views are conveyed to the suspect, but only to the extent that the officer's subjective views would affect a reasonable person's understanding of her freedom of action. *Houston v. State*, 185 S.W.3d 917, 920 (Tex. App.—Austin 2006, pet. ref'd). Station-house questioning does not, in itself, constitute custody for *Miranda* purposes. *Dowthitt*, 931 S.W.2d at 255. Police conduct during the course of an interrogation may escalate an initially voluntary inquiry into custodial interrogation. *Id*.

Appellant accepted the detectives' invitation or request to go to the sheriff's office to answer questions regarding her alleged sexual contact with K.B.C. Appellant acknowledges that she went to the sheriff's office voluntarily and that the initial questioning by the detectives was noncustodial. *See Anderson v. State*, 932 S.W.2d 502, 505 (Tex. Crim. App. 1996). She contends, however, that the interrogation became custodial when her requests for counsel (assuming that is what they were) were not honored. But the officers had no obligation under the Fifth Amendment to honor those requests if appellant was not in custody. *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). Appellant's argument in support of her contention is a form of bootstrapping: she asserts that she was in custody because she was not allowed to speak to the lawyer, and that she was entitled to speak to the lawyer because she was in custody. Appellant does not refer us to any authority holding that a person's request to speak with counsel, in and of itself, transforms a noncustodial interrogation into a custodial interrogation under the Fifth Amendment. We believe that the proper

8

question under *Stansbury* is whether a reasonable person in appellant's position would have believed that her freedom of movement was restrained to the degree associated with a formal arrest when the officers declined her suggestion that they call her attorney and, later, when they continued to question her after she told them that she needed to call the attorney.

Appellant was never physically restrained or told that she was under arrest. The only evidence even suggesting that appellant was in custody at the time she gave the officers the attorney's business card was Foster's statement, "I don't want you leaving here without you understanding what's going on, okay? And I don't want you to leave here without me understanding what's going on." The trial court found that these statements "did not mean that [appellant] could not leave," but that instead they "represented Detective Foster's objectives for the interview, or what he desired to accomplish during the non-custodial interview of [appellant]." We agree with the trial court that a reasonable person would not have understood the officer to be saying that she was under arrest or its functional equivalent.

The trial court found, and the record confirms, that the door to the interview room was unlocked while appellant was being questioned. Appellant was repeatedly told by the officers that she was free to leave at any time. Appellant was allowed to leave the interview room to use the restroom—apparently without supervision, as the video shows that the detectives briefly lost track of her and believed that she had left the building. Although appellant had the attorney's business card and her cell phone, she never attempted to call the attorney either from the interview room, from the hallway outside the interview room, or from the bathroom. In fact, even after the questioning ended and appellant was alone in the interview room, she called a friend but not the attorney.

9

We hold that under the circumstances shown by this record, a reasonable person in appellant's position would not have believed that her freedom of movement was restrained to the degree associated with a formal arrest at the time she was being questioned by the two detectives. Because appellant was not in custody, she had no Fifth Amendment right to counsel and the officers were not obligated to stop questioning her when she asked to speak to her attorney.[2]

***Voluntariness***

Appellant contends that her recorded statements to Foster and Garrett were involuntary under two different theories. *See Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008) (stating that statement can be involuntary under three different theories). First, she contends that her statements were involuntary under the Due Process Clause. U.S. Const. amend. XIV. Second, she contends that the statements were involuntary under article 38.22, section 6. Tex. Code Crim. Proc. Ann. art. 38.22, § 6 (West 2005). The voluntariness requirement applies to both custodial and noncustodial statements. *State v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999).

A confession is involuntary under the Due Process Clause only when there is official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free and unconstrained choice by its maker. *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995). Statements that have been found to be involuntary

_____

[2] For the same reason, the officers' failure to advise appellant of her rights before or during the course of the questioning did not render her statements inadmissible. *See Miranda v. Arizona*, 384 U.S. 436 (1966); Tex. Code Crim. Proc. Ann. art. 38.22, § 3 (West 2005).

10

under the Due Process Clause involve the crucial element of police overreaching and involve fact scenarios in which the suspect was subjected to threats, physical abuse, or extended periods of interrogation without rest or nourishment. *See Oursbourn*, 259 S.W.3d at 170-71 (collecting cases). Absent coercive police activity, a statement is not involuntary within the meaning of the Due Process Clause even if it was not the product of a meaningful choice by the speaker. *Id*. at 170 (citing *Colorado v. Connelly*, 479 U.S. 157 (1986)).

Article 38.22, section 6 provides that only voluntary statements may be admitted in evidence. The statute works in tandem with article 38.21, which provides that an accused's statement may be used in evidence against him "if it appears that the same was freely and voluntarily made without compulsion or persuasion." Tex. Code Crim. Proc. Ann. art. 38.21 (West 2005). Claims of involuntariness under these statutes can be, but need not be, predicated on police overreaching of the sort required under due process analysis. *Oursbourn*, 259 S.W.3d at 172. Under article 38.21 and 38.22, section 6, courts may consider, in addition to any allegedly coercive conduct by the police, factors such as the suspect's youth, intoxication, mental retardation, or other disability that would not raise a federal due process claim. *Id*. at 172-73.

To determine the voluntariness of a confession or other statement, all of the circumstances surrounding its acquisition must be considered. *Wyatt v. State*, 23 S.W.3d 18, 23 (Tex. Crim. App. 2000). After making its findings of fact, the trial court concluded that appellant's statements to the detectives were voluntary. Once again, we are bound by the trial court's findings of historical fact and consider only whether the court properly applied the law to those facts. *Id*.

11

Appellant contends that her oral admissions to the officers were coerced and involuntary for several reasons. First, she contends that she was not permitted to use the restroom. The record shows that when appellant first said she needed to use the restroom, Foster asked her if she could wait because they were "on a roll." Appellant agreed to wait, only to ask again a few minutes later. This time, appellant was allowed to go to the restroom without further delay. We find nothing in this record that could reasonably be considered police overreaching of the sort that would render a statement involuntary in either the due process or statutory sense.

Next, appellant urges that her statements were involuntary because the detectives did not allow her to call her attorney. The record reflects that appellant first gave the officers the attorney's business card and asked them to call. Later, reluctant to answer Foster's question as to whether she checked into a hotel with K.B.C., appellant said, "I need to call the attorney. I'm not trying to be rude." Foster said, "No" and began to play a recorded telephone call. It is unclear whether Foster was saying, "No, you may not call the lawyer" or "No, you are not being rude," and the trial court did not make a finding of fact with regard to this.

We have already held that appellant was not in custody. As the trial court found, appellant could have left the interview room at any time and called the attorney on her cell phone. Appellant also could have called from the restroom during that break in the questioning, which preceded her incriminating statements. And the strength of appellant's desire to speak to the attorney must be considered in light of her failure to call the attorney even after she was left alone in the interview room. If appellant felt constrained from calling the attorney in the detectives' presence, there is no evidence of coercive conduct by the detectives of such a nature that appellant's statements

12

were unlikely to have been the product of an essentially free and unconstrained choice. Similarly, there is no evidence that appellant's frustrated desire to speak with the attorney produced in her a state of mind that would render her later statements involuntary within the meaning of articles 38.21 and 38.22, section 6.

Appellant further argues that her incriminating oral statements were involuntary because Foster and Garrett repeatedly assured her that she would be allowed to leave the sheriff's office and go home with her children after the questioning ended, when in fact she was arrested and jailed. The trial court found that at the time the officers made those statements to appellant, they believed that she and her children would in fact be going home after the interview. This finding of fact is supported by Foster's testimony and is binding on this Court. Appellant also cites the detectives' statements to the effect that appellant had no reason to fear losing custody of her children if she admitted engaging in sexual activities with K.B.C. The trial court made no finding of fact as to whether the officers actually believed this to be true.

A promise in itself does not necessarily render a statement involuntary as a matter of due process, but it is a factor to consider in applying "totality of the circumstances" analysis. 41 George E. Dix & Robert O. Dawson, *Texas Practice: Criminal Practice & Procedure* § 13.193 (2d ed. 2001) (citing *Arizona v. Fulminante*, 499 U.S. 279, 285-88 (1991)). A promise will render a statement involuntary under articles 38.21 and 38.22, section 6 if it was positive, made or sanctioned by someone in authority, and of such an influential nature that it would cause a person to speak untruthfully. *Martinez v. State*, 127 S.W.3d 792, 794 (Tex. Crim. App. 2004). In *Alvarez v. State*, the district attorney's promise to the suspect that he would be allowed to go home after

13

giving a statement, when in fact he was arrested, was held not to be the primary incentive for the defendant to confess, and thus it did not render the confession involuntary. 649 S.W.2d 613, 620-21 (Tex. Crim. App. 1982). In *Gonzales v. State*, an officer's promise to the suspect that he would be allowed to go home after signing his statement, which he was allowed to do, was held not to be of such an influential nature as to cause the suspect to speak untruthfully. 4 S.W.3d 406, 414 (Tex. App.—Waco 1999, no pet.).

It is difficult to believe that Foster and Garrett truly thought that appellant had no reason to fear losing custody of her children as a result of her sexual relationship with K.B.C. However, trickery or deception does not make a statement involuntary unless the method was calculated to produce an untruthful confession or was offensive to due process. *Creager v. State*, 952 S.W.2d 852, 856 (Tex. Crim. App. 1997). We are satisfied that the detectives' promises and assurances to appellant did not constitute police coercion rendering appellant's inculpatory statements involuntary in the due process sense. We are also satisfied that these assurances would not have caused appellant to falsely confess to engaging in oral sex with K.B.C. Although the officers' assurances may have allayed some of appellant's fears regarding the potential consequences of her admissions, we do not believe that the were such as to render those admissions involuntary under articles 38.21 and 38.22, section 6.

Referring to her statement to the detectives, "[I]t's killing me because I'm not gonna leave here until I tell you the truth," appellant argues that she believed that she would not be allowed to leave the interview room until she had told the truth as Foster and Garrett saw, that is, until she confessed to engaging in sexual activities with K.B.C. The trial court found, on the other hand, that

14

this statement showed that appellant was "trying to work up the nerve . . . and overcome her hesitancy to admit her guilt . . . ." Considering the totality of the circumstances, including all of the circumstances cited by appellant and discussed above, we conclude that appellant's recorded oral statements during the noncustodial police questioning on September 14, 2006, were freely and voluntarily made.

We hold that the trial court did not err by overruling appellant's motion to suppress her recorded oral statements. Issues three, four, and five are overruled.

## CUMULATION ORDER AND MOTION FOR NEW TRIAL

After the jury returned its punishment verdicts, the State moved that the sentences be cumulated. The motion was granted over appellant's objection. Subsequently, appellant filed a motion for new trial asking that the court order a new trial as to punishment or, alternatively, set aside the cumulation order, and requesting a hearing. In the motion, appellant urged that the State, by requesting the cumulation order without prior notice to the defense, vindictively sought to punish her for declining the State's plea bargain offer and for exercising her right to a jury trial.[3] In two issues, appellant contends that the trial court abused its discretion by ordering that the sentences be served consecutively and by overruling her motion for new trial without conducting a hearing.

A trial court abuses its discretion in denying a hearing on a timely motion for new trial if the motion raises a matter outside the record upon which relief could be granted. *Flores v. State*, 18 S.W.3d 796, 798 (Tex. App.—Austin 2000, no pet.). Appellant argues that she was

---

[3] According to the motion for new trial, the State had offered appellant a seven-year probated sentence in exchange for a guilty plea.

entitled to a hearing in this case in order to further develop her prosecutorial vindictiveness claim. We disagree because the State's motive for requesting the cumulation order does not affect the validity of the order.

It is undisputed that the trial court was statutorily authorized to cumulate the three sentences in this cause. *See* Tex. Penal Code Ann. § 3.03(b)(2)(A) (West Supp. 2008). Section 3.03 does not condition the trial court's authority to cumulate sentences on the filing of a motion by the State. The task of cumulating sentences is assigned exclusively to the trial court. *Beedy v. State*, 250 S.W.3d 107, 110 (Tex. Crim. App. 2008). Whatever the State's motivation in moving for the sentences to be cumulated, the decision to have the sentences run consecutively was the trial court's alone. Further, a defendant does not have a due process right to advance notice that the sentences might be cumulated. *Millslagle v. State*, 150 S.W.3d 781, 784-85 (Tex. App.—Austin 2004, pet. dism'd, untimely filed). The trial court did not abuse its discretion by failing to conduct a hearing on appellant's motion for new trial. Issue one is overruled.

Appellant argues that the trial court's order imposing what is, in effect, a twenty-three-year prison term followed by a ten-year period of probation was, under the circumstances, outside the zone of reasonable disagreement. But absent an Eighth Amendment disproportionality claim, which appellant does not make, the court of criminal appeals has held that a trial court's decision to cumulate sentences is unassailable on appeal:

> Subject only to a very limited, "exceedingly rare," and somewhat amorphous Eighth Amendment gross-disproportionality review, a punishment that falls within the legislatively prescribed range, and that is based upon the jury's (or trial court's, in a bench trial) informed normative judgment, is unassailable on appeal. The same thing is true for the discretionary decision whether to cumulate sentences.

16

*Barrow v. State*, 207 S.W.3d 377, 381 (Tex. Crim. App. 2006) (footnote omitted); *see also Beedy*, 250 S.W.3d at 110. Issue two, by which appellant contends that the cumulation order was an abuse of the trial court's discretion, is overruled.

**INEFFECTIVE ASSISTANCE**

Appellant contends that she was denied her federal and state constitutional right to effective assistance of counsel at her trial. Appellant acknowledges that the Texas Constitution is no more protective of the right to counsel than the Sixth Amendment. *See Hernandez v. State*, 988 S.W.2d 770, 772 (Tex. Crim. App. 1999); *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986). Therefore, we will review appellant's contention under the Sixth Amendment standard enunciated in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Appellant must show that her trial attorneys made such serious errors that they were not functioning effectively as counsel and that these errors prejudiced her defense to such a degree that she was deprived of a fair trial. *Id.*

In reviewing a claim of ineffective assistance, we must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). To overcome this presumption, an allegation of ineffectiveness must be firmly founded in the record and the record must affirmatively demonstrate the alleged ineffectiveness. *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001). This burden is made more difficult when, as in this cause, the issue was not raised by motion for new trial and there is no record focused on the motives behind trial counsel's actions. *Id.*

Appellant contends that her trial attorneys were ineffective in three respects. First, she complains that they failed to timely object to K.B.C.'s testimony regarding the extraneous

act of sexual intercourse that occurred in Travis County. In fact, appellant's lead counsel not only did not object to K.B.C.'s testimony, he cross-examined K.B.C. about the incident. It was only during Detective Foster's testimony that counsel objected that the Travis County incident was an inadmissible extraneous offense under rule 404(b). Tex. R. Evid. 404(b). The trial court overruled the objection on the ground that it was not timely.

Notwithstanding rule 404, evidence of other crimes, wrongs, or acts committed against the child who is the alleged victim of a sexual assault is admissible for its bearing on the state of mind of the defendant and the child and on the relationship between the defendant and the child. Tex. Code Crim. Proc. Ann. art. 38.37, § 2 (West Supp. 2008). Thus, even a timely objection to the extraneous offense would have properly been overruled. Counsel was not ineffective for failing to timely object. *See Ex parte White*, 160 S.W.3d 46, 53 (Tex. Crim. App. 2004).

Next, appellant contends that her attorneys were ineffective because they did not object to the admission of State's exhibit 8, the recordings of her conversations with K.B.C. on September 12, 2006, on the ground of untimely notice. The record reflects, however, that before the State offered the exhibit in evidence, defense counsel cross-examined both K.B.C. and Foster regarding the content of these conversations. Moreover, when the State offered the exhibit, the trial court agreed to delay its ruling on the admission of the exhibit to give counsel more time to listen to the recordings. The following day, when the State reoffered the exhibit, appellant's attorney said that he had no objection. At the very least, there is no basis in this record for concluding that the defense was prejudiced by counsel's failure to object to the admission of exhibit 8.

Finally, appellant contends that her attorneys were ineffective "in failing to realize that these sentences could be cumulated without prior notice by the prosecution and in failing to advise Appellant that the sentences could be cumulated." As evidence supporting this claim, appellant cites trial counsel's written reply to the State's response to the motion for new trial. In this unsworn reply, appellant's lead trial counsel stated:

> [T]he State did not indicate that it would seek to stack the sentences in the event of a conviction. Rather, the State *contra-indicated* that it would seek to stack by offering a plea deal of probation/deferred adjudication. Consequently, defense counsel did not advise defendant of the possibility that the sentences could be stacked, thus exposing her to a significantly greater potential punishment than she would have been exposed to had she elected to reject a plea offer and go to trial in a case where stacking the sentences was not an option for the State. Thus, the State's failure to provide such notice inadvertently misled defense counsel, and thus assumed constitutional dimensions, ultimately depriving defendant of due process.

Appellant argues that if she had been advised by counsel that the sentences on the three counts might be cumulated, she could have made a better-informed decision regarding whether to accept the State's plea offer.

Appellant's brief implies, although it does not explicitly state, that she would have accepted the offered plea bargain if she had known that her sentences on each count could be cumulated. But assertions of fact in an appellate brief that are not supported by the record do not constitute evidence that may be considered on appeal. *McDonald v. State*, 64 S.W.3d 86, 89 (Tex. App.—Austin 2001, no pet.). Similarly, counsel's unsworn pleading does not constitute evidence. *See Perales v. State*, 226 S.W.3d 531, 536 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). The record before us is inadequate to determine what trial counsel told or did not tell appellant regarding

19

her potential punishment exposure, or the effect that this advice or lack of advice might have had on her decision to refuse the State's proffered plea bargain.

Appellant has not demonstrated that her trial counsel rendered constitutionally inadequate assistance. Issues six and seven are overruled.

The judgments of conviction are affirmed.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Puryear and Henson

Affirmed

Filed: August 11, 2009

Do Not Publish